**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

IN RE KARYOPHARM THERAPEUTICS INC. SECURITIES LITIGATION

Civ. Action No. 1:19-cv-11972-NMG

**CLASS ACTION**

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

Lead Plaintiff, Dr. Myo Thant ("Plaintiff"), by and through Plaintiff's counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, inter alia, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Karyopharm Therapeutics Inc. ("Karyopharm") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by Karyopharm; (c) analyst and media reports concerning Karyopharm; (d) other public information readily available on the internet; and (e) interviews with Karyopharm's former employees and/or consultants.

## I. INTRODUCTION

1. This securities class action is brought on behalf of all persons or entities that: (i) purchased shares of Karyopharm's securities between March 2, 2017 and February 22, 2019, inclusive (the "Class Period"); (ii) purchased Karyopharm shares in or traceable to its public offering of common stock conducted on April 26, 2017; and/or (iii) purchased Karyopharm shares in or traceable to its public offering of common stock conducted on May 3, 2018.

2. For the better part of the past decade, Karyopharm and its co-founders, Michael G. Kauffman and Sharon Shacham, have been developing a cancer-fighting drug known as "selinexor." Clinical data, according to the U.S. Food and Drug Administration ("FDA"), shows

that this drug is and has always been severely toxic and extremely limited in terms of efficacy.

3. To market a drug in the United States, a company must first obtain approval from the FDA. This requires the company to conduct clinical testing. If the results of the testing demonstrate that the drug is safe and effective, then the company must submit a New Drug Application ("NDA"). In this case, Karyopharm's clinical testing did ***not*** demonstrate that selinexor was safe or effective. Instead, it showed that the drug was severely toxic and barely effective, if at all.

4. Indeed, Karyopharm's key—or pivotal—study in support of selinexor's NDA was the "STORM Phase 2b" study. This study was supposed to demonstrate that selinexor was safe for patients to take and effective in terms of treatment. The results showed something significantly different. The STORM trial data evidenced severe toxicity based on, among other things, the fact that 100% of the enrolled patients experienced a treatment emergent adverse event, that nearly 60% of patients experienced a severe adverse event, and that over 25% of patients permanently discontinued selinexor due to one of these adverse events. Further, numerous patients died during the study as a result of taking selinexor. There were 42 on-study deaths in STORM, 18 of which were due to an adverse event caused by selinexor, including eight deaths that Karyopharm initially attempted to classify as "non-treatment related" that were later marked "treatment related" by the FDA.

5. Karyopharm's clinical trials fared no better in terms of proving efficacy. By design, the studies did not measure the effectiveness of selinexor by itself. Instead, Karyopharm's trials evaluated the effects of selinexor taken in combination with other already-approved drugs (such as the commonly used steroid dexamethasone). Thus, any benefits derived from the clinical data could not, according to the FDA, be attributed to selinexor over the dexamethasone. The ***one*** trial Karyopharm conducted towards measuring selinexor only (*i.e.*, single-agent use or monotherapy) had to be cancelled abruptly because of the harmful toxic effect it was having on study participants.

6. Contrary to the actual results shown by its clinical trials, Karyopharm and its

management told investors that selinexor resulted in better overall survival for patients than those who were not treating with selinexor. Karyopharm and its management went so far as to rely on secondary observational studies using real-world data that, as the FDA ultimately revealed, were not pre-specified in study protocols or statistical analysis plans and riddled with methodological errors that entirely undermined Karyopharm's conclusions. In fact, the real-world data demonstrated that patients who did not treat with selinexor were the ones with better overall survival.

7. Notwithstanding and in spite of the foregoing, Karyopharm and its co-founders filed their NDA for selinexor in August 2018. Six months later, on February 22, 2019, the FDA publicly released a briefing document identifying serious flaws in the NDA and the underlying clinical trial data for selinexor. In particular, the briefing document explained in detail that Karyopharm's clinical trials demonstrated a longstanding history of toxicity and limited efficacy findings due to its trial designs. Moreover, the briefing document faulted Karyopharm for violating pre-specified trial protocols and guidance when attempting to use "real-world" data observations to bolster its case for approval.

8. The FDA's briefing document, for the first time, provided investors with an unadulterated view of Karyopharm's clinical trial data. Suddenly, statements about the data made by Karyopharm and its co-founders prior to that point were revealed for what they truly were: false and/or materially misleading. In response, Karyopharm's stock price plummeted. From its closing price of $8.97 per share on February 21, 2019, Karyopharm's stock price fell to a closing price of $5.07 per share on February 22, 2019.

9. Karyopharm ultimately obtained approval for selinexor, but only for a very small group of potential patients, far smaller than indicated by Defendants during the Class Period. The revised patient population, according to the FDA, represented a population for which there was no approved therapy and, for all intents and purposes, had exhausted all existing available therapy. In other words, for this revised patient population, selinexor would be their last opportunity for treatment.

10. Defendants' statements during the Class Period materially misrepresented selinexor's safety and efficacy in the context of Karyopharm's clinical trial data. Plaintiff and other similarly situated investors were damaged as a result. Defendants are liable for these damages under the federal securities laws.

## II. BACKGROUND ALLEGATIONS

### A. Selinexor's Phase 1 Trial Data Demonstrates High Toxicity and Questionable Efficacy.

11. In 2012, Karyopharm commenced Phase 1 clinical testing for selinexor. The Phase 1 trial, referred to as KCP-330-001, evaluated the toxicity, safety, and tolerability of selinexor in patients with multiple myeloma and acute myeloid leukemia, among other types of cancer.

12. KCP-330-001 consisted of several study-arms and cohorts. In pertinent part, three arms within the study included patients with multiple myeloma who had received at least three lines of treatment or therapy with other available drugs prior to the study. The total number of these patients was 81.

13. Patients received either selinexor alone (monotherapy) or in combination with differing doses of dexamethasone (a steroid used in combination with cancer treatments).

14. Of the 81 patients treated across the dose ranges, only 7 (8.6%) patients responded, including one patient with a stringent complete response (optimal outcome) and six patients with partial response (moderate outcome). Most patients experienced stable or progressive disease (no response to selinexor).

15. Significantly, ***for multiple myeloma patients treated with only selinexor (monotherapy), only one out of 56 patients responded (and, at that, a partial response)***. To the extent response rates were higher in the combination arms, it was unclear whether the selinexor or dexamethasone was responsible.

16. Furthermore, data from the combination arms evidenced severe toxicity attributable to selinexor. Patients received doses of selinexor of 45 $mg/m^2$ (approximately equivalent to 80 mg) or 60 $mg/m^2$ (approximately equivalent to 100 mg) in combination with 20

mg of dexamethasone, twice weekly. Patients receiving the lower dose of selinxor were treated for a longer period than patients receiving the higher dose. In fact, patients receiving the lower dose had a median duration of exposure of 115 days versus the higher dose patients who were only able to withstand treatment for a median of 15 days. Discontinuation of treatment was due to treatment emergent adverse events, including for example pneumonia, sepsis, and even death.

**B. SOPRA Phase 2 Trial Data Shows Additional Safety and Efficacy Concerns.**

17. Notwithstanding the safety (toxicity) and efficacy issues demonstrated in Phase 1, Karyopharm commenced Phase 2 testing for selinexor in 2014. Two of these trials are the SOPRA trial (KCP-330-008) and STORM trial (KCP-330-012).

18. Karyopharm commenced the SOPRA trial in June 2014. The trial was designed to study the effect of selinexor in patients 60 years or older with acute myeloid leukemia who were ineligible for standard intensive chemotherapy and/or transplantation.

19. Patients in the SOPRA trial either received a fixed dose of 60 mg of selinexor twice per week or standard treatment from their physicians. In total, 118 patients received selinexor and 57 patients received standard care.

20. Disturbingly, ***overall survival results demonstrated a trend towards worse survival with selinexor compared to the patients receiving standard care from their physicians***. Median overall survival for patients receiving selinexor was 94 days versus 170 days for patients receiving standard care. In other words, patients receiving selinexor died almost twice as fast as patients who did not receive selinexor.

21. In addition, ***safety data from the SOPRA study showed that selinexor was dangerously toxic***: 100% of the evaluable patients that received selinexor experienced adverse events; 80% experienced serious adverse events; and 20% experienced adverse events that led to death.

22. SOPRA's trial data demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity.

### C. STORM Phase 2 Trial Evidences Further Safety and Efficacy Problems.

23. The STORM trial, which Karyopharm conducted between May 2015 and April 2018, was a Phase 2b trial consisting of two "parts."

24. Part 1 of the STORM study initially included as an "exploratory subset" a number of multiple myeloma patients who had received three prior lines of treatment. However, in November 2015, the FDA approved daratumumab (Darzalex) to treat multiple myeloma in patients having received three prior lines of treatment. Consequently, to "address changes in the treatment landscape" for multiple mylemoa, Karyopharm modified its trial protocol for Part 2 of the STORM study to focus on selinexor's efficacy in in patients with at least three lines of prior treatment.

25. Part 2 of the STORM trial expanded testing to include an additional 120 multiple myeloma patients who had received at least three prior lines of treatment or therapies. Dosing was set at 80mg of selinexor and 20mg of dexamethasone twice per week. Karyopharm selected this dosage without evaluation of the efficacy and safety data of the lower doses used in its Phase 1 trial.

26. Karyopharm designed the STORM trial as a single-arm study. This meant that the data from STORM would not be compared to a control-group arm. Consequently, ***neither Karyopharm nor the FDA would have any means of assessing the efficacy of selinexor by itself and apart from the effects of dexamethasone***. This was a significant flaw in terms of study design, given the fact that Karyopharm's Phase 1 trial of selinexor did not demonstrate efficacy on its own (*i.e.*, monotherapy).

27. In addition to the design flaw, the data from the STORM trial raised serious doubts about selinexor's safety and efficacy. In pertinent part, the FDA concluded that "[t]reatment with selinexor in combination with dexamethasone on STORM was associated with significant toxicity," "[a]ll patients (100%) enrolled and treated on STORM experienced at least one TEAE [treatment emergent adverse event]," "[t]here was a high frequency of severe TEAEs, with nearly all (94.1 %) patients experiencing at least one Grade 3 or 4 TEAE and almost two-thirds (58.4%)

of patients experiencing at least one serious AE (SAE) [serious adverse event]," and "[o]ver one-quarter (26.7%) of patients permanently discontinued selinexor due to a TEAE and 18 (8.9%) patients . . . had a fatal TEAE."

28. The following table provides a numerical overview of the safety data:

| AE Category | Part 1 (N = 79) n (%) | Part 2 (N = 123) n (%) | Total (N = 202) n (%) |
|---|---|---|---|
| Any TEAE | 79 (100) | 123 (100) | 202 (100) |
| Any Grade 3 or 4 TEAE | 75 (94.9) | 115 (93.5) | 190 (94.1) |
| Serious TEAE | 44 (55.7) | 74 (60.2) | 118 (58.4) |
| Discontinuation due to TEAE | 21 (26.6) | 33 (26.8) | 54 (26.7) |
| Fatal TEAE | 8 (10.1) | 10 (8.1) | 18 (8.9) |

(Source: FDA Analysis)

29. In addition to the safety concerns, trial data demonstrated significant issues with regard to Karyopharm's dosing during the study and, in turn, the data's ability to demonstrate efficacy. In particular, "patients in Part 2 experienced at least one dose modification (including dose reduction, dose interruption, or permanent discontinuation of selinexor) due to any cause," "[a] total of 109 (88.6%) patients required at least one dose modification due a TEAE," and "35 (28.5%) patients permanently discontinued selinexor due to a TEAE."

30. The following table illustrates the dosing modifications during Part 2 of the STORM study:

| Action Taken with Selinexor | Part 2 (N = 123) n (%) |
|---|---|
| Dose modification due to TEAE | 109 (88.6) |
| Dose reduced | 71 (57.7) |
| Dose interrupted | 84 (68.3) |
| Drug discontinued | 35 (28.5) |
| All dose modifications (due to any cause) | 121 (98.4) |

(Source: Applicant's Response to FDA Information Request Dated January 23, 2019)

31. Tragically, a substantial number of study participants died in connection with their selinexor treatment. Specifically, "[t]here were 42 on-study deaths in STORM, 19 (24.1%) in Part 1 and 23 (18.7%) in Part 2" and "[a]pproximately half of the deaths (22) were attributable to progressive disease, and the remainder (20) were either due to a TEAE (18) or were attributed to progressive disease by [Karyopharm] but had insufficient information to support this attribution (2)."

32. The following table summarizes the treatment deaths during the STORM trial:

| Reason for Death | Part 1 (N = 79) n (%) | Part 2 (N = 123) n (%) | Total (N = 202) n (%) |
|---|---|---|---|
| All causes | 19 (24.1) | 23 (18.7) | 42 (20.8) |
| Disease progression | 9 (11.4) | 13 (10.6) [*] | 22 (10.9) |
| TEAE | 8 (10.1) [a] | 10 (8.1) [b] | 18 (8.9) |
| Insufficient information | 2 (2.5) [c] | 0 | 2 (0.5) |

[*] Reason for death updated from "unknown" to progressive disease after data cut-off.
[a] Causes of death include dyspnea, influenza, cardiorespiratory arrest (2), subdural hematoma, multiple organ dysfunction syndrome, ascites and plasma cell leukemia, and respiratory failure
[b] Causes of death include pneumonia (2), sepsis (2), subdural hematoma, cardiac disorder, fungal sepsis, multiple organ dysfunction syndrome, respiratory arrest, septic shock
[c] Subjects [redacted] (b) (6) and [redacted] (b) (6)
(Source: FDA Analysis)

33. Karyopharm had initially attempted to minimize and/or conceal the number of deaths related to treatment emergent advese events. In pertinent part, the FDA explained that,

"[r]egarding the deaths due to TEAEs, [Karyopharm] classified these cases as either 'treatinent related' or 'non-treatment related;' . . . of the 10 deaths due to a TEAE in Part 2, [Karyopharm] designated 2 deaths as 'treatment related' (pneumonia and sepsis), and the remaining 8 deaths as 'non-treatment related' (pneumonia, sepsis, subdural hematoma, cardiac disorder, fungal sepsis, multiple organ dysfunction syndrome, respiratory arrest, and septic shock). However, because treatment with selinexor is associated with risk of infection, it is notable that 4 of the 8 deaths classified as 'non-treatment related' were due to infection. Given the difficulty in ascertaining the baseline incidence of adverse events in a population of patients with advanced [multiple myeloma] on a single arm trial, the [FDA] considers all deaths due to a TEAE in this setting to be treatment-related, unless clearly related to other extraneous causes."

34. Given the high incidence of treatment emergent adverse events and treatment emergent serious adverse events, the FDA concluded that Karyopharm's proposed selinexor dose of 80 mg twice weekly "may not be tolerable." Data from STORM Part 2 supported this conclusion, given that "subjects remaining on the starting dose continued to decrease over time, with a median duration on selinexor 80 mg twice weekly of 3.5 weeks." Significantly, "[t]he poor tolerability of high doses of selinexor was also observed in [Karyopharm's] Phase 1 clinical trial (KCP-330-001)" that compared doses of 45 $mg/m^2$ (approximately equivalent to 80 mg) or 60 $mg/m^2$ (approximately equivalent to 100 mg), the former resulting in a median duration of treatment of 115 days and the latter resulting in 15 days.

35. In sum, the STORM Part 2 trial data demonstrated limited efficacy and significant toxicity in patients with multiple myeloma. Given the limited efficacy and significant toxicity demonstrated by the trial, ***selinexor in combination with dexamethasone did not demonstrate a clinically meaningful benefit outweighing the risks of treatment***.

**D. Karyopharm Cancels the SOPRA Study Due to Unacceptable Toxicity.**

36. On March 2, 2017, Karyopharm abruptly terminated its ongoing SOPRA study.

37. Karyopharm claimed at the time that it had "determined, in concert with SOPRA's Independent Data Safety Monitoring Board, or DSMB, that the study would not reach statistical

significance for showing . . . the study's primary endpoint."

38. Absent from Karyopharm's statement was that the SOPRA trial data evidenced that selinexor was extremely toxic, as discussed above. Any benefits attributable to selinexor were heavily outweighed by the drug's toxicity.

**E. <u>To Obtain Efficacy Data, Karyopharm Launches the BOSTON Trial.</u>**

39. Karyopharm commenced a Phase 3 trial, referred to as the BOSTON trial (KCP-330-023), in June 2017. Based on data received from a previous clinical trial, Karyopharm designed the Phase 3 BOSTON study to test selinexor in combination with two additional cancer treatment drugs (Velcade and low-dose dexamethasone) in patients with multiple myeloma who have had one to three prior lines of therapy.

40. Karyopharm designed the BOSTON study to test selinexor in combination with Velcade and dexamethasone against Velcade and dexamethasone by themselves. Importantly, unlike the STORM study, the design of the BOSTON study would allow Karyopharm and the FDA to evaluate selinexor's efficacy and safety against a control-arm.

41. Patients in the BOSTON trial receiving selinexor received doses of 100 mg once per week along with 20 mg of dexamethasone twice weekly and 1.3 $mg/m^2$ of Velcade once per week. Importantly, the doses of dexamethasone and Velcade in the selinexor-arm of the study were 25% and 40% less than in the control-arm (dexamethasone and Velcade only), respectively. The purpose of this dosing modification was to reduce toxicity related to Velcade and dexamethasone, thereby allowing Karyopharm and the FDA to better assess the toxicity created by selinexor.

**F. <u>Karyopharm and the FDA Agree on the Contents of Selinexor's NDA.</u>**

42. On June 22, 2018, Karyopharm had a "Type B" pre-NDA meeting with the FDA. Shacham and Kauffman, among others, attended the meeting on behalf of Karyopharm.

43. The purpose of a "Type B" pre-NDA meeting is to allow a company to present in summary form the content of the data it intends to submit to the FDA in support of an NDA. If acceptable, the FDA will confirm that the data package warrants submission of an NDA.

44. During the meeting, Karyopharm discussed the various data it intended to submit in support of its NDA for selinexor as well as addressed specific questions concerning the NDA.

45. In pertinent part, the FDA confirmed that Karyopharm's use of "real-world" data would require details regarding selection criteria, handling of missing data, and elimination of bias. The FDA also confirmed that Karyopharm would rely on "real-world" data for supportive analyses only.

46. Karyopharm agreed that the "real-world" data would be used for supportive analyses alone, and that it would provide comprehensive selection and analysis methods for the data it used.

**G. <u>Karyopharm Files the New Drug Application for Selinexor.</u>**

47. On August 5, 2018, Karyopharm submitted its NDA for selinexor along with a request for accelerated approval. The FDA received the NDA on August 6, 2018.

48. Based primarily on the STORM Part 2 efficacy and safety data, Karyopharm's NDA sought approval to market selinexor in combination with dexamethasone for the treatment of adult patients with multiple myeloma who have received at least ***three*** prior therapies. The proposed dose was 80 mg in combination with 20 mg of dexamethasone, twice per week.

49. Without prior protocol review or consent from the FDA and despite Karyopharm's representations to the FDA about its NDA during the pre-NDA meeting on June 22, 2018 (discussed above), Karyopharm included in the NDA analyses from a retrospective observational study, referred to as Karyopharm's "real-world data" or "RWD" study (Study KS-50039). The objective of the RWD study was to compare the survival distribution of patients in the real-world using electronic health records with patient data from Part 2 of the STORM trial.

50. On October 6, 2018, Karyopharm submitted its final study report to the FDA in support of the NDA, which included additional data and analyses relating to the RWD study.

51. The RWD study was severely flawed. As later disclosed by the FDA, the analyses within the study were not pre-specified and, as such, the study had major methodological issues, including selection bias, misclassification, confounding, missing data, and immortal time bias

(observation of time periods in which death cannot occur). Moreover, the real-world data were not comparable to the data obtained in Part 2 of STORM, the survival estimates obtained from the real-world data did not estimate survival of the population enrolled in Part 2 of STORM, direct comparison of the survival estimates obtained from the real-world data and Part 2 of STORM provided biased estimates of treatment effect (*i.e.*, differences in the study arms were likely to yield favorable overall survival data).

### H. Karyopharm Has a Post Mid-Cycle Review Meeting with the FDA.

52. On November 20, 2018, the FDA held a post mid-cycle meeting with Karyopharm via teleconference. Mid-cycle review meetings are conducted to discuss and/or address, among other things, key findings and issues that could impact approval. A post mid-cycle review meeting is similar in terms of purpose, and is used by the FDA to further address issues that could impact approval. The discussions held at mid-cycle and post-mid cycle review meetings are considered when deciding whether or not to approve an application.

53. During Karyopharm's post mid-cycle review meeting, the FDA expressed concern about whether STORM could support approval of selinexor. The STORM study was a single-arm trial which, by design, could not evaluate selinexor's safety and/or efficacy separate and apart from dexamethasone. Accordingly, the FDA did not believe that it would demonstrate that selinexor and dexamethasone provided an advantage over available therapies and about the toxicity of this regimen.

### I. FDA Expresses Strong Objections to Karyopharm's Safety and Efficacy Conclusions.

54. On December 12, 2018, the FDA sent Karyopharm a written request for information concerning the RWD study. In particular, the FDA asked Karyopharm why it had not pre-specified the RWD study in its trial protocol or statistical analysis plan. The FDA also requested information relating to potential flaws in the analysis, such as the comparability of the real-world patients to patients in the STORM study.

55. On December 16 and 27, 2018, Karyopharm responded to the FDA. In pertinent

part, Karyopharm acknowledged that it was required to discuss the RWD study with the FDA in advance of filing the NDA. Karyopharm also modified the RWD study's analysis so as to compare only a subset of real-world patients that were more similar to the patients in the STORM study, thus reducing the potential for confusing or overly optimistic conclusions.

56. On January 4, 2019, the FDA sent Karyopharm a further request for information concerning the RWD study's methodological flaws. In pertinent part, the FDA further revised Karyopharm's criteria for comparing real-world patient data to the STORM patients.

57. On January 11, 2019, Karyopharm responded to the FDA by updating its RWD study analyses in line with the FDA's instructions. However, despite Karyopharm removing nearly half of the patients examined, the RWD study analyses continued to demonstrate evidence of incomparability between the real-world patients and STORM patients.

58. The FDA ultimately concluded that the evidence generated from the real-world data analysis was not adequate to provide context and/or comparison for the overall survival observed in the STORM patients and, therefore, did not accept it as supportive evidence for the NDA. This conclusion was based primarily on the lack of comparability between the treatment groups within STORM and the real-world data. Further, the FDA noted that Karyopharm's post-hoc strategies to create greater comparability across cohorts were contrary to FDA guidance and resulted in very limited sample size and unstable estimates.

59. Due to the fact that the FDA had neither reviewed nor consented to a protocol for the RWD study prior to receiving the NDA on August 6, 2018, the FDA was unwilling to accept the results as support for selinexor. The FDA had no way of knowing whether the protocol was pre-specified and unchanged, or modified post-hoc, and therefore the study was at risk of leading to overly optimistic conclusions. Furthermore, when revising the real-world data to include only patients that the FDA could consider as "comparable" to STORM patients, the data set became too small to be representative and the analysis was therefore unable to support any conclusions concerning selinexor.

### J. <u>The FDA Votes to Delay Approval of Selinexor Pending Additional Data from the BOSTON Trial.</u>

60. On February 26, 2019, the FDA convened its Oncologic Drug Advisory Committee to review Karyopharm's NDA and hold an advisory vote.

61. During the ODAC meeting, the FDA presented several issues of concern. <u>First</u>, the FDA once again told Karyopharm that STORM did not properly evaluate selinexor's efficacy due to its trial design. STORM was a single-arm trial intended to evaluate the combination of selinexor and dexamethasone. Given (1) that historical studies have shown dexamethasone to effectively treat multiple myeloma and (2) selinexor did not demonstrate single-agent activity in Karyopharm's Phase 1 trial, STORM was unable to yield persuasive efficacy evidence despite its role as the pivotal trial for selinexor's NDA.

62. <u>Second</u>, the FDA emphasized its concerns over selinexor's significant toxicity. In Part 2 of STORM, 100% of patients experienced a treatment emergent adverse event, over 60% experienced a serious adverse event, over 90% required a dose modification due to these adverse events, and about 25% of patients discontinued treatment because of an adverse event. Due to the fact that Karyopharm designed STORM without a control-arm, the FDA was unable to interpret these safety results in favor of selinexor. Instead, given the toxicity findings from SOPRA (*i.e.*, worse overall survival in patients treating with selinexor), the FDA was left to conclude that selinexor resulted in significant toxicity.

63. <u>Third</u>, the FDA observed that STORM did not provide a conclusion in terms of selinexor's optimal dose, which was one of the study's objectives. Karyopharm based its proposed starting dose (*i.e.*, 80 mg in combination with 20 mg of dexamethasone, twice weekly) on its Phase 1 trial data. However, while the Phase 1 trial showed that lower doses were better tolerated, Karyopharm did not evaluate selinexor doses lower than 80 mg during the Phase 1 trial (or, for that matter, during STORM). Without additional data, and in light of the fact that data indicated a relationship between higher exposures and adverse events, the FDA was left to conclude that lower doses of selinexor would be better tolerated.

64. In light of the above, ODAC voted to delay the approval of selinexor until the FDA could review results from Karyopharms' ongoing BOSTON trial.

**K. <u>After the Class Period, Karyopharm Amends NDA for Selinexor by Narrowing Target Patient Population.</u>**

65. On March 13, 2019, following the ODAC meeting on February 26, 2019 and an additional post-ODAC meeting with the FDA on March 11, 2019, Karyopharm submitted a "major amendment" to its NDA for selinexor.

66. In pertinent part, Karyopharm amended the NDA by narrowing selinexor's proposed indication from adult patients with multiple myeloma who had received ***three*** previous lines of treatment or therapy to patients who had received ***four*** previous lines of treatment or therapy. Karyopharm severely narrowed the indication for selinexor in response to concerns regarding the risk-benefit profile in the originally proposed patient population.

67. Karyopharm based its amendment on the results from a pre-specified subgroup of 83 patients from Part 2 of the STORM study who had received at least four prior therapies. Importantly, the revised patient population represented a population for which there was no approved therapy and, for all intents and purposes, had exhausted all existing available therapy. In other words, for this revised patient population, selinexor would be their last opportunity for treatment.

**L. <u>The FDA Grants a Limited Approval for Selinexor.</u>**

68. On July 2, 2019, in response to Karyopharm's "major amendment" and based upon additional BOSTON trial data, the FDA granted approved selinexor for the new indication, *i.e.*, multiple myeloma patients who had received at least four prior lines of therapy or treatment.

69. The FDA explained that treatment with selinexor was associated with significant toxicity and, based on Karyopharm's decision to conduct single-arm studies, the efficacy of selinexor could not be clearly determined. The STORM trial did not isolate the treatment effect of selinexor and selinexor did not demonstrate efficacy by itself in the Phase 1 trial. Additionally, patients in Part 2 of the STORM trial required dose modifications early in the trial, suggesting

that the proposed starting dose of 80 mg twice weekly was poorly tolerated. Notwithstanding, given the changed indication and the fact that the new patient population were presently without an approved treatment, the FDA was willing to approve selinexor.

70. In granting approval, the FDA required Karyopharm to provide additional information from the ongoing BOSTON trial to verify the benefit of selinexor in patients with multiple myeloma. The FDA also required, among other things, Karyopharm to conduct a randomized Phase 2 trial to test the safety and efficacy of selinexor in multiple doses.

71. In sum, the FDA approved selinexor despite its severe toxicity and failure to demonstrate efficacy without dexamethasone because the revised indication sought to treat a population of patients that, for all intents and purposes, had no other viable means of treatment.

## III. SECURITIES ACT ALLEGATIONS

### A. Jurisdiction and Venue

72. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

73. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v(a)).

74. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 22 of the Securities Act (15 U.S.C. § 77v(a)). Karyopharm securities trade on the NASDAQ, located within this Judicial District.

75. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### B. Parties

76. Plaintiff purchased Karyopharm securities at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. Plaintiff incorporates by reference his "Certification" at Docket No. 14-2, which

includes a list of his transactions in Karyopharm securities during the Class Period.

77. Plaintiff purchased shares in Karyopharm that, upon information and belief, are traceable to and/or were purchased pursuant to the registration statement and prospectus for the offering held on April 26, 2017. As evidenced in the list of transactions accompanying Plaintiff's "Certification" (incorporated by reference herein), Plaintiff purchased 77,852 shares of Karyopharm stock between April 28, 2017 (the date new shares from the offering were delivered to purchasers) and June 7, 2017 (the last date Plaintiff purchased shares prior to the expiration of a 60-day lock-up agreement in effect for the offering). During this period of time, a total of 7,289,700 shares of Karyopharm stock were traded (according to Yahoo! Finance). Consequently, the 3,902,439 shares sold in the offering comprised approximately 53% of the shares traded.

78. Similarly, Plaintiff purchased shares in Karyopharm that, upon information and belief, are traceable to and/or were purchased pursuant to the registration statement and prospectus for the offering held on May 3, 2018. As evidenced in the list of transactions accompanying Plaintiff's "Certification" (incorporated by reference herein), Plaintiff purchased 4,290 shares of Karyopharm stock on May 8, 2018. Between May 7, 2018 (the date new shares from the offering were delivered to purchasers) and May 8, 2018 (the date of Plaintiff's purchases), a total of 1,877,400 shares of Karyopharm stock were traded (according to Yahoo! Finance). Consequently, the 9,152,543 shares sold in the offering likely comprised a significant portion of the shares traded on these two days.

79. Defendant Karyopharm is a Delaware corporation with its corporate headquarters located at 85 Wells Avenue, 2nd Floor, Newton, Massachusetts.

80. Defendant Michael G. Kauffman ("Kauffman") is a co-founder of Karyopharm, has served as its Chief Executive Officer since January 2011, and has been a Director since 2008.

81. Defendant Justin A. Renz ("Renz") was an Executive Vice President of Karyopharm and served as the Company's Chief Financial Officer ("CFO") from August 18, 2014 until his resignation on April 3, 2017. Defendant Renz continued to provide certain advisory and other consulting services to until January 31, 2018.

82. Defendant Michael F. Falvey ("Falvey") was an Executive Vice President of Karyopharm and served as CFO and Treasurer from September 11, 2017 until January 18, 2019.

83. Defendant Garen G. Bohlin ("Bohlin") has served as a Director of Karyopharm at all relevant times.

84. Defendant Mikael Dolsten ("Dolsten") has served as a Director of Karyopharm at all relevant times.

85. Defendant Scott Garland ("Garland") has served as a Director of Karyopharm at all relevant times.

86. Defendant Barry E. Greene ("Greene") has served as a Director of Karyopharm at all relevant times.

87. Defendant Mansoor Raza Mirza ("Mirza") has served as a Director of Karyopharm at all relevant times.

88. Defendant Deepa R. Pakianathan ("Pakianathan") has served as a Director of Karyopharm at all relevant times.

89. Defendant Kenneth E. Weg ("Weg") served as a Director of Karyopharm from February 2013 until June 19, 2018.

**C. Untrue and Materially Misleading Statements**

**1. April 26, 2017: Prospectus**

90. Karyopharm filed a registration statement with the SEC on November 8, 2016.

91. Kauffman, Renz, Bohlin, Dolsten, Garland, Greene, Pakianathan, Mirza, and Weg signed the registration statement dated November 8, 2016.

92. Pursuant to a prospectus dated April 26, 2017, which formed part of the registration statement dated November 8, 2016, Karyopharm sold 3,902,439 shares of common stock to the public for $10.25 per share. In total, Karyopharm raised $38,048,780 in proceeds from the offering (before expenses).

93. Karyopharm's prospectus incorporated by reference several reports previously filed with the SEC, including its annual report on Form 10-K for the fiscal year ended December

31, 2016 (the "2016 Annual Report").

94. The 2016 Annual Report contained a materially misleading update concerning Karyopharm's SOPRA study and the import it had on selinexor's clinical development in general. In pertinent part, the 2016 Annual Report stated as follows:

> In March 2017, we reported that we had determined, in concert with SOPRA's Independent Data Safety Monitoring Board, or DSMB, that the study would not reach statistical significance for showing superiority of OS on selinexor versus OS on PC, the study's primary endpoint.
>
> Based on unaudited site data, SOPRA enrolled 176 patients, with a median of two prior treatment regimens, in the U.S., Canada, Europe and Israel. Among patients on the selinexor arm, 13% demonstrated a CR with or without full hematologic recovery, or CRi, compared to 3% of patients on the PC control arm. Some patients remained on selinexor for over one year, but this did not result in a statistically superior OS compared to the PC arm. However, since the 13% of selinexor-treated patients who achieved a CR (with or without full hematologic recovery) showed a substantial OS benefit as compared with the PC arm, we and the DSMB agreed that patients would be permitted to continue on the selinexor arm or the PC arm, as applicable, following discussion between the patient and their treating physician.
>
> The DSMB found no new clinically significant AEs in the patients receiving selinexor. Rates of sepsis and febrile neutropenia, or FN, were lower on the selinexor arm where the rate of sepsis was 4.9% and the rate of FN was 14.7%. In comparison, the rate of sepsis on the PC arm was 6.1% and the rate of FN was 36.4%. As expected, the most common selinexor-related AEs were nausea, anorexia, fatigue, vomiting, and thrombocytopenia.

95. Karyopharm's above-statements about the SOPRA trial and, in particular, the reasons leading to its termination were materially misleading. In addition to not showing evidence of efficacy, trial data disturbingly also showed a trend towards worse overall survival with selinexor compared to the patients receiving standard care from their physicians, contrary to Karyopharm's representation that "selinexor-treated patients . . . showed a substantial [overall survival] benefit as compared with the [control] arm." As discussed previously in Section II.B., median overall survival for patients receiving selinexor was 94 days versus 170 days for patients receiving standard care. Moreover, 100% of the evaluable patients that received selinexor experienced adverse events, 80% experienced serious adverse events, and 20% experienced

adverse events that led to death. SOPRA's trial data demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity.

96. This was material information that would have been considered by investors when deciding whether to purchase Karyopharm's stock in the April 26, 2017 offering. The SOPRA study was unique relative to Karyopharm's other clinical trials, given that it was designed to test selinexor by itself (*i.e.*, single-agent or monotherapy) instead of in combination with other available treatments (*e.g.*, dexamethasone). This was important in light of the fact that Karyopharm's previous Phase 1 trials evidenced little-to-no efficacy in patients receiving selinexor by itself and significant toxicity when tested in combination with dexamethasone, as explained above in Section II.A. Thus, the toxicity evidence from the SOPRA trial that was omitted from the 2016 Annual Report would have demonstrated to investors that selinexor posed severe safety issues in addition to the disclosed efficacy shortcomings.

97. By disclosing its reasons for terminating the SOPRA trial, Karyopharm was duty-bound to speak truthfully and in a manner that would not mislead investors. The 2016 Annual Report failed to do this and, as a result, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

**2. May 3, 2018: Prospectus**

98. Karyopharm filed a registration statement with the SEC on January 26, 2018.

99. Kauffman, Falvey, Bohlin, Dolsten, Garland, Greene, Pakianathan, Mirza, and Weg signed the registration statement dated January 26, 2018.

100. Pursuant to a prospectus dated May 3, 2018, which formed part of the registration statement dated January 26, 2018, Karyopharm sold 9,152,543 shares of common stock to the public for $14.75 per share. In total, Karyopharm raised $126,900,008 in proceeds from the offering (before expenses).

101. Karyopharm's prospectus incorporated by reference several reports previously filed with the SEC, including its annual report on Form 10-K for the fiscal year ended December

31, 2017 (the "2017 Annual Report").

102. The 2017 Annual Report contained a materially misleading update concerning Karyopharm's SOPRA study and the import it had on selinexor's clinical development in general. In pertinent part, the 2017 Annual Report stated as follows:

> . . . In March 2017, we reported that we had determined, in concert with SOPRA's independent Data Safety Monitoring Board (DSMB), that the study would not reach statistical significance for showing superiority of OS on selinexor versus OS on PC, the study's primary endpoint. Based on unaudited site data, among patients on the selinexor arm, 13% demonstrated a CR with or without full hematologic recovery (CRi), compared to 3% of patients on the PC control arm. Some patients remained on selinexor for over one year, but this did not result in a statistically superior OS compared to the PC arm. However, since the 13% of selinexor-treated patients who achieved a CR (with or without full hematologic recovery) showed a substantial OS benefit as compared with the PC arm, we and the DSMB agreed that patients would be permitted to continue on the selinexor arm or the PC arm, as applicable, following discussion between the patient and their treating physician.
>
> The DSMB found no new clinically significant AEs in the patients receiving selinexor. Rates of sepsis and febrile neutropenia (FN) were lower on the selinexor arm than the PC arm: on selinexor, the rate of sepsis was 4.9% versus 6.1% for the PC arm; the rate of FN on selinexor was 14.7% versus 36.4% on the PC arm. As expected, the most common selinexor-related AEs were nausea, anorexia, fatigue, vomiting, and thrombocytopenia.

103. Karyopharm's above-statements about the SOPRA trial and, in particular, the reasons leading to its termination were materially misleading. Karyopharm disclosed only a portion of the safety information it obtained from the trial while omitting other material information relating to the same topic. Specifically, trial data disturbingly showed a trend towards worse overall survival with selinexor compared to the patients receiving standard care from their physicians, contrary to Karyopharm's representation that "selinexor-treated patients . . . showed a substantial [overall survival] benefit as compared with the [control] arm." As discussed previously in Section II.B., median overall survival for patients receiving selinexor was 94 days versus 170 days for patients receiving standard care. Moreover, 100% of the evaluable patients that received selinexor experienced adverse events, 80% experienced serious adverse events, and 20% experienced adverse events that led to death. SOPRA's trial data demonstrated that that any

benefits attributable to selinexor were abrogated by its toxicity.

104. This was material information that would have been considered by investors when deciding whether to purchase Karyopharm's stock in the May 3, 2018 offering. Karyopharm had recently completed its pivotal Phase 2b STORM study by the time of the offering. The STORM study, unlike SOPRA, was not designed to evaluate selinexor by itself (*i.e.*, single-agent or monotherapy). Instead, STORM evaluated the safety and efficacy of selinexor when used in combination with dexamethasone, as explained in Section II.C. Thus, any data obtained from the STORM study would be of limited value in terms of assessing the effects of selinexor only. The safety information omitted from the 2017 Annual Report's description of the SOPRA study, therefore, would have been of particular importance to investors when attempting to evaluate the prospects and risks of investing in Karyopharm.

105. By disclosing its reasons for terminating the SOPRA trial, Karyopharm was duty-bound to speak truthfully and in a manner that would not mislead investors. The 2017 Annual Report failed to do this and, as a result, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

106. Karyopharm's prospectus also incorporated by reference its current report on Form 8-K dated April 30, 2018, which attached a press release, also dated April 30, 2018, titled "Karyopharm Announces Positive Top-Line Data from Phase 2b STORM Study Evaluating Selinexor in Patients with Penta-Refractory Multiple Myeloma."

107. In its April 30, 2018 press release, Karyopharm materially misled investors with regard to the STORM study results and selinexor's safety profile in general. In pertinent part, the press release stated:

> The data reported today are from Part 2 of the international, multi-center, single-arm Phase 2b STORM (Selinexor Treatment of Refractory Myeloma) study, which enrolled 122 heavily pretreated patients with penta-refractory myeloma. Each patient received 80mg oral selinexor twice weekly in combination with low-dose dexamethasone (20mg twice weekly). . . . .

> Oral selinexor demonstrated a predictable and manageable tolerability profile, with safety results that were consistent with those previously reported from Part 1 of this study (Vogl et al., *J Clin Oncol*, 2018) and from other selinexor studies. As anticipated, the most common adverse events (AEs) were nausea, vomiting, fatigue and reduced appetite and were primarily low grade and manageable with standard supportive care and/or dose modification. The most common hematologic AEs were Grade ≥3 cytopenias and were generally not associated with clinical sequelae. Karyopharm plans to submit detailed STORM study results for presentation at an upcoming medical oncology meeting.

108. Karyopharm's above-statements were materially misleading. Although certain data from Part 2 of the STORM study was consistent with Part 1, this data did ***not*** "demonstrate[] a predictable and manageable tolerability profile." As discussed previously in Section II.C., the STORM trial data evidenced significant toxicity based on, among other things, the fact that 100% of the enrolled patients experienced a treatment emergent adverse event, that nearly 60% of patients experienced a severe adverse event, and that over 25% of patients permanently discontinued selinexor due to one of these adverse events.

109. Further, the sheer number and magnitude of treatment-related deaths in the STORM study contradicts Karyopharm's positive representation about selinexor's "predictable and manageable tolerability profile." There were 42 on-study deaths in STORM, 19 in Part 1 and 23 in Part 2. Nearly half of these deaths (18, to be specific) were due to an adverse event caused by selinexor, including eight deaths that Karyopharm initially attempted to classify as "non-treatment related" that were later marked "treatment related" by the FDA. STORM Part 2 did ***not*** "demonstrate[] a predictable and manageable tolerability profile"; it showed the opposite.

110. Moreover, while Karyopharm represented that the "predictable and manageable tolerability profile" supposedly demonstrated in STORM was "consistent" with data from its "other selinexor studies," previous studies in fact showed similar poor tolerability for selinexor. As demonstrated in Karyopharm's Phase 1 clinical trial, patients receiving higher doses of selinexor exhibited significantly shorter durations of treatment due to the drug's toxicity, as explained in Section II.A.

111. The SOPRA study, too, evidenced selinexor's severe toxicity. Safety data from

the SOPRA study showed that: 100% of the evaluable patients that received selinexor experienced adverse events; 80% experienced serious adverse events; and 20% experienced adverse events that led to death. SOPRA's trial data demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity.

112. Consequently, neither STORM nor Karyopharm's prior studies "demonstrated a predictable and manageable tolerability profile"; to the contrary, Karyopharm's studies as of May 3, 2018 demonstrated a highly toxic drug with a safety record evidencing extremely poor tolerability. This information was material and, if disclosed, would have been considered by investors when deciding whether to purchase Karyopharm stock.

113. On September 17, 2019 when this lawsuit was commenced, Karyopharm's common stock traded at $11.67 per share.

### D. Count I – Section 11 of the Securities Act

114. Plaintiff repeats and realleges the allegations in ¶¶11-113 as if set forth fully herein.

115. Plaintiff brings this Count I against Karyopharm, Kauffman, Renz (with respect to the April 26, 2017 offering), Falvey (with respect to the May 3, 2018 offering), Bohlin, Dolsten, Garland, Greene, Pakianathan, Mirza, and Weg.

116. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Karyopharm common stock sold pursuant or traceable to the offerings on April 26, 2017 and/or May 3, 2018, and who were damaged thereby.

117. The registration statements for the April 26, 2017 and May 3, 2018 offerings were defective and inaccurate, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

118. The defendants named in this Count were responsible for the contents and dissemination of the registration statements.

119. The defendants named in this Count each caused the issuance of the registration statements and/or signed the registration statements, either personally or through an Attorney-in-Fact.

120. The defendants named in this Count each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the registration statements. They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading. None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the registration statements were true, were without omission of any material facts, and/or were not misleading.

121. Plaintiff purchased Karyopharm's stock in the April 26, 2017 and May 3, 2018 offerings, or traceable thereto, in reliance upon the defective registration statements and without knowledge of the untruths and/or omissions alleged herein and have been damaged thereby.

122. By reasons of the conduct herein alleged, each defendant named in this Count violated the Securities Act.

123. This claim is brought within one year after the discovery of the untrue statements and omissions in the registration statements and within three years of the effective date of the registration statements.

### E. <u>Count II – Section 15 of the Securities Act</u>

124. Plaintiff repeats and realleges the allegations in ¶¶11-123 as if set forth fully herein.

125. Plaintiff brings this Count II pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Kauffman, Renz (with respect to the April 26, 2017 offering), Falvey (with respect to the May 3, 2018 offering), Bohlin, Dolsten, Garland, Greene, Pakianathan, Mirza, and Weg.

126. Each of the defendants named in this Count was a control person of Karyopharm by virtue of his or her position as a director, senior officer, and/or authorized representative of Karyopharm. By reason of their role(s) at Karyopharm, as alleged above, the defendants named

in this Count, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Karyopharm to engage in the conduct complained of herein. In addition, the defendants named in this Count each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Karyopharm. By reason of such conduct, the defendants named in this Count are liable pursuant to Section 15 of the Securities Act.

127. Each of the defendants named in this Count was a culpable participant in the violations of the Securities Act alleged in Count I above, based on their having signed the registration statements and/or having otherwise participated in the process which allowed the offerings to be successfully completed.

## IV. EXCHANGE ACT ALLEGATIONS

### A. Jurisdiction and Venue

128. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

129. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

130. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). Karyopharm securities trade on the NASDAQ, located within this Judicial District.

131. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### B. Parties

132. Plaintiff purchased Karyopharm securities at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws

alleged herein. Plaintiff incorporates by reference his "Certification" at Docket No. 14-2, which includes a list of his transactions in Karyopharm securities during the Class Period.

133. Defendant Karyopharm is a Delaware corporation with its corporate headquarters located at 85 Wells Ave, 2nd Floor, Newton, Massachusetts.

134. Defendant Kauffman is a co-founder of Karyopharm, has served as its Chief Executive Officer since January 2011, and has been a Director since the Company's founding in 2008.

135. Defendant Sharon Shacham ("Shacham") is a co-founder of Karyopharm and has served as its President and Chief Scientific Officer since December 2013 and October 2010, respectively.

136. Defendants Kauffman and Shacham because of their positions with Karyopharm, possessed the power and authority to control the contents of Karyopharm's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of these defendants was provided with copies of Karyopharm's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## C. Materially False and Misleading Statements

### 1. March 2, 2017: Press Release

137. On March 2, 2017, Karyopharm issued a press release titled, "Karyopharm Announces Results from Interim Analysis of Phase 2 SOPRA Study Evaluating Selinexor in Relapsed/Refractory Acute Myeloid Leukemia."

138. The press release contained materially misleading representations about Karyopharm's SOPRA study and the import it had on selinexor's clinical development in general.

In pertinent part, the press release stated as follows:

> NEWTON, Mass., March 02, 2017 (GLOBE NEWSWIRE) -- Karyopharm Therapeutics Inc. (Nasdaq:KPTI), a clinical-stage pharmaceutical company, today announced the results of a planned interim analysis of the Phase 2 SOPRA study evaluating single agent selinexor in relapsed/refractory acute myeloid leukemia (AML). The Company determined in concert with the study's independent Data Safety Monitoring Board (DSMB) that SOPRA will not reach statistical significance for overall survival (OS), the study's primary endpoint. However, since ***selinexor-treated patients that achieved a complete response (CR) showed a substantial OS benefit as compared with the physician's choice (PC) arm***, Karyopharm and the DSMB agreed that patients would be permitted to continue on the selinexor arm or the PC arm, as applicable, following discussion between the patient and their treating physician. . . . .
>
> . . . Among patients on the selinexor arm, 13% demonstrated a CR with or without full hematologic recovery (CRi) compared to 3% of patients on the PC control arm. Some patients remained on selinexor for over one year, but this did not result in a statistically superior OS compared to the PC arm. The DSMB found no new clinically significant adverse events in the patients receiving selinexor. Importantly, rates of sepsis and febrile neutropenia (FN) were lower on the selinexor arm (sepsis 4.9%, FN 14.7%) compared to the PC arm (sepsis 6.1%, FN 36.4%). As expected, the most common selinexor-related adverse events were nausea, anorexia, fatigue, vomiting, and thrombocytopenia. Patients who have benefited from selinexor treatment on the SOPRA study have the option to continue therapy.
>
> . . .
>
> "After performing an in-depth analysis, we and the DSMB agree that, despite the higher complete response rates observed with selinexor, the phase 2 SOPRA study evaluating single-agent selinexor in relapsed or refractory AML has not reached statistical significance for overall survival, the primary endpoint of the study," said Michael G. Kauffman, MD, PhD, Chief Executive Officer of Karyopharm. "While we are disappointed with the overall outcome, we are pleased that ***60mg of single-agent selinexor dosed twice per week was well-tolerated*** and carried no increased risk of sepsis or febrile neutropenia. At Karyopharm, our primary focus remains the advancement of selinexor in relapsed or refractory multiple myeloma, where we believe we have a clear path to regulatory approval."

Emphasis added.

139. Karyopharm's and Kauffman's above-statements (including those identified in emphasis) about the SOPRA trial and, in particular, the reasons leading to its termination were materially misleading. In addition to not showing evidence of efficacy, trial data disturbingly also

showed a trend towards worse overall survival with selinexor compared to the patients receiving standard care from their physicians, contrary to Karyopharm's representation that "selinexor-treated patients . . . showed a substantial [overall survival] benefit as compared with the [control] arm." As discussed previously in Section II.B., median overall survival for patients receiving selinexor was 94 days versus 170 days for patients receiving standard care. Moreover, 100% of the evaluable patients that received selinexor experienced adverse events, 80% experienced serious adverse events, and 20% experienced adverse events that led to death. SOPRA's trial data demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity.

140. This was material information that would have been considered by investors when deciding whether to purchase Karyopharm's stock. The SOPRA study was unique relative to Karyopharm's other clinical trials, given that it was designed to test selinexor by itself (*i.e.*, single-agent or monotherapy) instead of in combination with other available treatments (*e.g.*, dexamethasone). This was important in light of the fact that Karyopharm's previous Phase 1 trials evidenced little-to-no efficacy in patients receiving selinexor by itself and significant toxicity when tested in combination with dexamethasone, as explained above in Section II.A. Thus, the toxicity evidence from the SOPRA trial that was omitted from the March 2, 2017 press release would have demonstrated to investors that selinexor posed severe safety issues in addition to the disclosed efficacy shortcomings.

141. By disclosing its reasons for terminating the SOPRA trial, Karyopharm was duty-bound to speak truthfully and in a manner that would not mislead investors. The March 2, 2017 press release failed to do this and, as a result, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

**2. March 16, 2017: Press Release**

142. On March 16, 2017, Karyopharm issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2016.

143. In the press release, Karyopharm identified several "recent events, highlights and

milestones," including the outcome of the SOPRA study. Karyopharm's description of the SOPRA study results was materially misleading to the extent that it concealed adverse safety data and conclusions. In pertinent part, the press release stated:

> In March 2017, Karyopharm announced the results of the planned interim analysis of the Phase 2 SOPRA study evaluating single-agent selinexor in relapsed or refractory acute myeloid leukemia (AML). In concert with the study's independent Data Safety Monitoring Board (DSMB), the Company determined that the SOPRA study would not reach statistical significance for showing superiority of overall survival (OS) on selinexor versus OS on physician's choice (PC), the study's primary endpoint. However, since the 13% of selinexor-treated patients who achieved a complete response with or without full hematologic recovery (CR/CRi) ***showed a substantial OS benefit as compared to PC***, they will be permitted to continue on the selinexor arm or the PC arm, as applicable, following discussion between the patient and his or her treating physician. Importantly, selinexor demonstrated a safety profile consistent with previous studies. Importantly, in the selinexor arm, there were similar rates of sepsis and lower rates of febrile neutropenia compared with the PC arm. Karyopharm plans to continue to explore the use of selinexor in combination with novel and standard agents through investigator-sponsored AML studies in both adults and children.

Emphasis added.

144. Karyopharm's above-statements (including those identified in emphasis) about the SOPRA trial were materially misleading given that the study data showed a trend towards worse overall survival with selinexor compared to the patients receiving standard care from their physicians. Consequently, the data from the study directly contradicted and undermined Karyopharm's representation that "selinexor-treated patients . . . showed a substantial [overall survival] benefit as compared to [the control arm]." As discussed previously in Section II.B., median overall survival for patients receiving selinexor was 94 days versus 170 days for patients receiving standard care. Moreover, 100% of the evaluable patients that received selinexor experienced adverse events, 80% experienced serious adverse events, and 20% experienced adverse events that led to death. SOPRA's trial data demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity.

145. This was important in light of the fact that Karyopharm's previous Phase 1 trials evidenced little-to-no efficacy in patients receiving selinexor by itself and significant toxicity

when tested in combination with dexamethasone, as explained above in Section II.A. Thus, the toxicity evidence from the SOPRA trial that was omitted from the March 16, 2017 press release would have demonstrated to investors that selinexor posed severe safety issues in addition to the disclosed efficacy shortcomings.

### 3. March 16, 2017: Annual Report

146. On March 16, 2017, Karyopharm published the 2016 Annual Report.

147. The 2016 Annual Report contained a materially misleading update concerning Karyopharm's SOPRA study and the import it had on selinexor's clinical development in general. In pertinent part, the 2016 Annual Report stated as follows:

> In March 2017, we reported that we had determined, in concert with SOPRA's Independent Data Safety Monitoring Board, or DSMB, that the study would not reach statistical significance for showing superiority of OS on selinexor versus OS on PC, the study's primary endpoint.
>
> Based on unaudited site data, SOPRA enrolled 176 patients, with a median of two prior treatment regimens, in the U.S., Canada, Europe and Israel. Among patients on the selinexor arm, 13% demonstrated a CR with or without full hematologic recovery, or CRi, compared to 3% of patients on the PC control arm. Some patients remained on selinexor for over one year, but this did not result in a statistically superior OS compared to the PC arm. However, since the 13% of selinexor-treated patients who achieved a CR (with or without full hematologic recovery) showed a substantial OS benefit as compared with the PC arm, we and the DSMB agreed that patients would be permitted to continue on the selinexor arm or the PC arm, as applicable, following discussion between the patient and their treating physician.
>
> The DSMB found no new clinically significant AEs in the patients receiving selinexor. Rates of sepsis and febrile neutropenia, or FN, were lower on the selinexor arm where the rate of sepsis was 4.9% and the rate of FN was 14.7%. In comparison, the rate of sepsis on the PC arm was 6.1% and the rate of FN was 36.4%. As expected, the most common selinexor-related AEs were nausea, anorexia, fatigue, vomiting, and thrombocytopenia.

148. Karyopharm's above-statements about the SOPRA trial and, in particular, the reasons leading to its termination were materially misleading. In addition to not showing evidence of efficacy, trial data disturbingly also showed a trend towards worse overall survival with selinexor compared to the patients receiving standard care from their physicians, contrary to

Karyopharm's representation that "selinexor-treated patients . . . showed a substantial [overall survival] benefit as compared with the [control] arm." As discussed previously in Section II.B., median overall survival for patients receiving selinexor was 94 days versus 170 days for patients receiving standard care. Moreover, 100% of the evaluable patients that received selinexor experienced adverse events, 80% experienced serious adverse events, and 20% experienced adverse events that led to death. SOPRA's trial data demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity.

149. This was material information that would have been considered by investors when deciding whether to purchase Karyopharm's stock in the April 26, 2017 offering. The SOPRA study was unique relative to Karyopharm's other clinical trials, given that it was designed to test selinexor by itself (*i.e.*, single-agent or monotherapy) instead of in combination with other available treatments (*e.g.*, dexamethasone). This was important in light of the fact that Karyopharm's previous Phase 1 trials evidenced little-to-no efficacy in patients receiving selinexor by itself and significant toxicity when tested in combination with dexamethasone, as explained above in Section II.A. Thus, the toxicity evidence from the SOPRA trial that was omitted from the 2016 Annual Report would have demonstrated to investors that selinexor posed severe safety issues in addition to the disclosed efficacy shortcomings.

150. By disclosing its reasons for terminating the SOPRA trial, Karyopharm was duty-bound to speak truthfully and in a manner that would not mislead investors. The 2016 Annual Report failed to do this and, as a result, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

**4. March 16, 2017: Conference Call**

151. On March 16, 2017, Karyopharm held a conference call with analysts and investors to discuss its earnings and operations for fiscal 2016, as well as its clinical update on selinexor.

152. During the conference call, Kauffman made material misrepresentations about

selinexor's safety profile relative to the SOPRA trial results. In pertinent part, Kauffman stated:

> <Q: Michael Schmidt [Analyst]> . . . And a question I guess on the AML trial. Obviously, that was a very difficult indication in general to the trials in, I guess my impression was that based on the Phase 1 data the rationale in AML for selinexor was pretty strong.
>
> And I guess my question is how do you interpret those results and what read-through is there to the other indications that are being pursued with the drug just based on a mechanism -- mechanistic interpretation? Thank you.
>
> <A: Michael Kauffman> Sure. Well I think, as you said, this is one of the most difficult if not the most difficult disease in the hematologic malignancy space. It's a disease which, frankly, in the US has no approved drugs.
>
> This is the elderly population that is not eligible for chemotherapy. So nothing has made it yet, nothing showed a benefit.
>
> I think we were actually very excited to see a 13% CR/CRI rate which shows the drug is clearly very active. This is against the 3% CR/CRI rate in the control arm. So we know we have very good activity of the drug.
>
> ***We also know that the patients that did achieve CR***, and they usually do that in the first one to two cycles, ***do much better than the overall population on either arm of the study***. So that was clearly a benefit for that 13%, the 13% of patients.
>
> We think the only real read-through that you can garner given how difficult the syndication is and the age of the patients is really on the safety side.

Emphasis added.

153. Kauffman's response to the analyst question during the March 16, 2017 conference call was materially misleading. Kauffman led investors to believe that patients who received selinexor in the SOPRA study fared better than those that did not. The SOPRA study data, however, showed that the opposite was true. Trial data demonstrated a trend towards worse overall survival with selinexor compared to the patients receiving standard care from their physicians, as discussed previously in Section II.B.

### 5. August 8, 2017: Conference Call

154. On August 8, 2017, Karyopharm held a conference call with analysts to discuss its results for the second quarter ended June 30, 2017.

155. During the call, Kauffman misrepresented selinexor's safety profile in the context of Karyopharm's historical trial data. In pertinent part, Kauffman stated:

> An important takeaway I'd like to mention here is about the emerging safety profile for selinexor particularly as we are no longer treating patients with doses higher than 80 milligrams twice weekly. With the dosing regimens that are being utilized in our key trials, . . . selinexor continues to be well tolerated particularly when used once weekly in the combination regimens of study. Adverse events tend to be highly predictable and manageable with standard supportive care and/or dose modifications. And as you know, we have had patients on selinexor for more than 1 to 2 years.

156. Kauffman's above-statements during the August 8, 2017 conference call were materially misleading. As of the date of the conference call, Karyopharm's trial data from its Phase 1 study, SOPRA study, and STORM Part 1 study demonstrated that selinexor was ***not*** "well tolerated" in any regimen, alone or in combination with other drugs.

157. In Phase 1, patients receiving higher doses of selinexor exhibited significantly shorter durations of treatment due to the drug's toxicity, as explained in Section II.A. In SOPRA, data showed that: 100% of the evaluable patients that received selinexor experienced adverse events; 80% experienced serious adverse events; and 20% experienced adverse events that led to death, as explained in Section II.B. And, in STORM Part 1, data evidenced significant toxicity based on, among other things, the fact that 100% of the enrolled patients experienced a treatment emergent adverse event, that nearly 60% of patients experienced a severe adverse event, and that over 25% of patients permanently discontinued selinexor due to one of these adverse events, as explained in Section II.C.

158. Contrary to Kauffman's statement during the August 8, 2017, Karyopharm's clinical trial data to date demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity. This information was material and, if disclosed, would have been considered by investors when deciding whether to purchase Karyopharm stock.

**6. November 2, 2017: Conference Call**

159. On November 2, 2017, Karyopharm held a conference call with analysts to discuss

its earnings for the third quarter of fiscal 2017 ended September 30, 2017.

160. During the conference call, Kauffman misrepresented selinexor's safety profile in the context of Karyopharm's existing clinical data. In pertinent part, Kauffman stated:

> Before I move on to our other pipeline assets, I'd just like to highlight the emerging overall safety profile for selinexor. We are no longer treating patients with doses higher than 80 milligrams twice weekly, and the dosing regimens that are being utilized in our key trials, . . . continue to show that selinexor has a manageable safety profile, particularly when used once weekly in the combination regimens under study. The adverse events we are seeing are highly predictable and manageable with standard supportive care and/or dose modification, and patients have been on selinexor for more than 1 to 2 years.

161. Kauffman's above-statements during the November 2, 2017 conference call were materially misleading. As of the date of the conference call, Karyopharm's trial data from its Phase 1 study, SOPRA study, and STORM Part 1 study demonstrated that selinexor did ***not*** have a "manageable safety profile" in any regimen, alone or in combination with other drugs.

162. In Phase 1, patients receiving higher doses of selinexor exhibited significantly shorter durations of treatment due to the drug's toxicity, as explained in Section II.A. In SOPRA, data showed that: 100% of the evaluable patients that received selinexor experienced adverse events; 80% experienced serious adverse events; and 20% experienced adverse events that led to death, as explained in Section II.B. And, in STORM Part 1, data evidenced significant toxicity based on, among other things, the fact that 100% of the enrolled patients experienced a treatment emergent adverse event, that nearly 60% of patients experienced a severe adverse event, and that over 25% of patients permanently discontinued selinexor due to one of these adverse events, as explained in Section II.C.

163. Contrary to Kauffman's statement during the November 2, 2017, Karyopharm's clinical trial data to date demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity. This information was material and, if disclosed, would have been considered by investors when deciding whether to purchase Karyopharm stock.

### 7. March 15, 2018: Annual Report

164. On March 15, 2018, Karyopharm published its 2017 Annual Report.

165. The 2017 Annual Report contained a materially misleading update concerning Karyopharm's SOPRA study and the import it had on selinexor's clinical development in general. In pertinent part, the 2017 Annual Report stated as follows:

> . . . In March 2017, we reported that we had determined, in concert with SOPRA's independent Data Safety Monitoring Board (DSMB), that the study would not reach statistical significance for showing superiority of OS on selinexor versus OS on PC, the study's primary endpoint. Based on unaudited site data, among patients on the selinexor arm, 13% demonstrated a CR with or without full hematologic recovery (CRi), compared to 3% of patients on the PC control arm. Some patients remained on selinexor for over one year, but this did not result in a statistically superior OS compared to the PC arm. However, since the 13% of selinexor-treated patients who achieved a CR (with or without full hematologic recovery) showed a substantial OS benefit as compared with the PC arm, we and the DSMB agreed that patients would be permitted to continue on the selinexor arm or the PC arm, as applicable, following discussion between the patient and their treating physician.
>
> The DSMB found no new clinically significant AEs in the patients receiving selinexor. Rates of sepsis and febrile neutropenia (FN) were lower on the selinexor arm than the PC arm: on selinexor, the rate of sepsis was 4.9% versus 6.1% for the PC arm; the rate of FN on selinexor was 14.7% versus 36.4% on the PC arm. As expected, the most common selinexor-related AEs were nausea, anorexia, fatigue, vomiting, and thrombocytopenia.

166. Karyopharm's above-statements about the SOPRA trial and, in particular, the reasons leading to its termination were materially misleading. Karyopharm disclosed only a portion of the safety information it obtained from the trial while omitting other material information relating to the same topic. Specifically, trial data disturbingly showed a trend towards worse overall survival with selinexor compared to the patients receiving standard care from their physicians, contrary to Karyopharm's representation that "selinexor-treated patients . . . showed a substantial [overall survival] benefit as compared with the [control] arm." As discussed previously in Section II.B., median overall survival for patients receiving selinexor was 94 days versus 170 days for patients receiving standard care. Moreover, 100% of the evaluable patients that received selinexor experienced adverse events, 80% experienced serious adverse events, and

20% experienced adverse events that led to death. SOPRA's trial data demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity.

167. This was material information that would have been considered by investors when deciding whether to purchase Karyopharm's stock. Karyopharm had recently completed its pivotal Phase 2b STORM study by the point in time. The STORM study, unlike SOPRA, was not designed to evaluate selinexor by itself (*i.e.*, single-agent or monotherapy). Instead, STORM evaluated the safety and efficacy of selinexor when used in combination with dexamethasone, as explained in Section II.C. Thus, any data obtained from the STORM study would be of limited value in terms of assessing the effects of selinexor only. The safety information omitted from the 2017 Annual Report's description of the SOPRA study, therefore, would have been of particular importance to investors when attempting to evaluate the prospects and risks of investing in Karyopharm.

168. By disclosing its reasons for terminating the SOPRA trial, Karyopharm was duty-bound to speak truthfully and in a manner that would not mislead investors. The 2017 Annual Report failed to do this and, as a result, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

**8. April 30, 2018: Press Release**

169. On April 30, 2018, Karyopharm issued a press release titled "Karyopharm Announces Positive Top-Line Data from Phase 2b STORM Study Evaluating Selinexor in Patients with Penta-Refractory Multiple Myeloma."

170. In its April 30, 2018 press release, Karyopharm materially misled investors with regard to the STORM study results and selinexor's safety profile in general. In pertinent part, the press release stated:

> The data reported today are from Part 2 of the international, multi-center, single-arm Phase 2b STORM (Selinexor Treatment of Refractory Myeloma) study, which enrolled 122 heavily pretreated patients with penta-refractory myeloma. Each patient received 80mg oral selinexor twice weekly in combination with low-dose

> dexamethasone (20mg twice weekly). . . . .
>
> Oral selinexor demonstrated a predictable and manageable tolerability profile, with safety results that were consistent with those previously reported from Part 1 of this study (Vogl et al., *J Clin Oncol*, 2018) and from other selinexor studies. As anticipated, the most common adverse events (AEs) were nausea, vomiting, fatigue and reduced appetite and were primarily low grade and manageable with standard supportive care and/or dose modification. The most common hematologic AEs were Grade ≥3 cytopenias and were generally not associated with clinical sequelae. Karyopharm plans to submit detailed STORM study results for presentation at an upcoming medical oncology meeting.

171. Karyopharm's above-statements were materially misleading. Although certain data from Part 2 of the STORM study was consistent with Part 1, this data did ***not*** "demonstrate[] a predictable and manageable tolerability profile." As discussed previously in Section II.C., the STORM trial data evidenced significant toxicity based on, among other things, the fact that 100% of the enrolled patients experienced a treatment emergent adverse event, that nearly 60% of patients experienced a severe adverse event, and that over 25% of patients permanently discontinued selinexor due to one of these adverse events.

172. Further, the sheer number and magnitude of treatment-related deaths in the STORM study contradicts Karyopharm's positive representation about selinexor's "predictable and manageable tolerability profile." There were 42 on-study deaths in STORM, 19 in Part 1 and 23 in Part 2. Nearly half of these deaths (18, to be specific) were due to an adverse event caused by selinexor, including eight deaths that Karyopharm initially attempted to classify as "non-treatment related" that were later marked "treatment related" by the FDA. STORM Part 2 did ***not*** "demonstrate[] a predictable and manageable tolerability profile"; it showed the opposite.

173. Moreover, while Karyopharm represented that the "predictable and manageable tolerability profile" supposedly demonstrated in STORM was "consistent" with data from its "other selinexor studies," previous studies in fact showed similar poor tolerability for selinexor. As demonstrated in Karyopharm's Phase 1 clinical trial, patients receiving higher doses of selinexor exhibited significantly shorter durations of treatment due to the drug's toxicity, as explained in Section II.A.

174. The SOPRA study, too, evidenced selinexor's severe toxicity. Safety data from the SOPRA study showed that: 100% of the evaluable patients that received selinexor experienced adverse events; 80% experienced serious adverse events; and 20% experienced adverse events that led to death. SOPRA's trial data demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity.

175. Consequently, neither STORM nor Karyopharm's prior studies "demonstrated a predictable and manageable tolerability profile"; to the contrary, Karyopharm's studies as of May 3, 2018 demonstrated a highly toxic drug with a safety record evidencing extremely poor tolerability. This information was material and, if disclosed, would have been considered by investors when deciding whether to purchase Karyopharm stock.

**9. May 1, 2018: Conference Call**

176. On May 1, 2018, Karyopharm hosted a conference call with analysts and investors to discuss results from the Phase 2b STORM clinical data.

177. During the conference call, Kauffman materially misled investors concerning selinexor's safety and efficacy profile in the context of Karyopharm's existing trial data. In pertinent part, Kauffman stated:

> The success of the STORM study is an important milestone for Karyopharm. And ***these data represent a significant step in establishing the efficacy and safety of selinexor*** as a new treatment option for patients with myeloma. These data also support the ongoing combination BOSTON and STOMP studies using selinexor as a novel backbone therapy in earlier lines of myeloma treatment. We look forward to submitting detailed STORM study results for presentation in an upcoming medical oncology meeting.
>
> . . .
>
> Yes. Thank you, Paul and Sundar. That was really well said. And we noticed that you guys were sort of dealing with all the side effects and not, it wasn't really a major issue, which is great. And I think a lot of the sites, that certainly the vast majority of the sites on Part 2 of the study were well educated and knew what to expect and really got on top of things pretty quickly. And luckily, we don't have too many major organ toxicities. We don't have any that we know of in particular, so it was easier. And then one other comment that we will be coming out in our future medical meeting, but we did say it and I'll reiterate it. ***This duration of***

> ***response in the PR group is -- even at this early date, it's already associated with statistically significant improvement in overall survival as compared to the patients who had stable disease or worse***. So we do know that patients staying on the drug who have a response will live longer than those that are -- unfortunately do not respond to the drug, which we think bodes very well for the utility of this drug and the way we -- that doctors and other people look at the activity of sel/dex in this end-stage population.

Emphasis added.

178. Kauffman's above-statements, including in particular those identified in emphasis, were materially misleading. STORM Part 2 did yielded data that fell squarely in line with Karyopharm's previous trials which, as explained above in Section II.A through Section II.C., failed to demonstrate selinexor's efficacy or safety. To the contrary, STORM Part 2 evidenced the fact that selinexor was highly toxic and, due to its study design, failed to show that selinexor resulted in positive patient responses. Thus, STORM Part 2's data did ***not*** "represent a significant step" towards "establishing the efficacy and safety of selinexor" and did ***not*** establish "statistically significant improvement," as Kauffman claimed.

179. Indeed, the data from the STORM trial showed that treatment with selinexor in the study was associated with significant toxicity. This was evidenced by the fact that all patients experienced at least one treatment emergent adverse event, almost two-thirds of patients experienced at least one serious adverse event, over one-quarter of patients discontinued treatment due to these adverse events, and nearly 10% of patients in the study died because of a treatment-related adverse event. Given the high incidence of treatment emergent adverse events and treatment emergent serious adverse events, the study demonstrated that Karyopharm's proposed selinexor dose of 80 mg twice weekly would not be tolerable.

180. Karyopharm's previous clinical data demonstrated the same safety concerns too. In Phase 1, patients receiving higher doses of selinexor exhibited significantly shorter durations of treatment due to the drug's toxicity, as explained in Section II.A. In SOPRA, data showed that: 100% of the evaluable patients that received selinexor experienced adverse events; 80% experienced serious adverse events; and 20% experienced adverse events that led to death, as

explained in Section II.B. And, in STORM Part 1, data evidenced significant toxicity based on, among other things, the fact that 100% of the enrolled patients experienced a treatment emergent adverse event, that nearly 60% of patients experienced a severe adverse event, and that over 25% of patients permanently discontinued selinexor due to one of these adverse events, as explained in Section II.C.

181. Further, with respect to selinexor's efficacy, STORM Part 2 did not demonstrate "statistically significant improvement in overall survival" because, as explained above in Section II.C., the study was not capable of doing so. STORM Part 2 tested selinexor in combination with dexamethasone and, unlike Phase 1 or SOPRA, did not examine the effects of selinexor by itself (*i.e.*, single-agent or monotherapy). Thus, to the extent Karyopharm obtained any positive data in terms of efficacy from STORM Part 2, it had no basis for attributing the results to the effects of selinexor when, to the contrary, historical study data demonstrated dexamethasone to be responsible for positive outcomes in multiple myeloma patients.

182. Contrary to Kauffman's statements during the May 1, 2018 conference call, Karyopharm's clinical trial data to date demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity and/or attributable to dexamethasone. Thus, STORM Part 2 did not constitute a "significant step in establishing the efficacy and safety of selinexor" or demonstrate "statistically significant improvement in overall survival." This information was material and, if disclosed, would have been considered by investors when deciding whether to purchase Karyopharm stock.

**10. August 7, 2018: Conference Call**

183. On August 7, 2018, Karyopharm hosted a conference call with analysts to discuss its earnings for the second quarter of fiscal 2018 ended June 30, 2018.

184. During the call, Shacham provided investors with a false representation that Karyopharm had complied with the FDA's requirements when filing the NDA. Specifically, in response to an analyst question, Shacham stated as follows:

> <Q: Jenny M. Leeds [Analyst]> This is Jenny on for Ying. Congrats on all the progress and filing your NDA. Just a question for us, in terms of the NDA, what was included in the safety package? Was it just the safety re STORM, or did you have a lot of the other trials also in there for the safety package?
>
> <A: Sharon Shacham> As typical in an NDA, this is being discussed with the FDA, and ***we are following the FDA guidance*** with what we include in the NDA, and we included most of the data in hematological cancers for the safety information.

Emphasis added.

185. Shacham's above-statements, including in particular the statement identified in emphasis, were false and/or materially misleading. Karyopharm had, in fact, ***not*** followed "FDA guidance" when submitting the NDA.

186. On June 22, 2018, Karyopharm had a "Type B" pre-NDA meeting with the FDA. At the meeting, which Shacham and Kauffman attended in person, the FDA and Karyopharm confirmed that Karyopharm's use of "real-world" data would be for supportive analyses only and would include details regarding selection criteria, handling of missing data, and elimination of bias, as discussed above in Section II.F.

187. Karyopharm's agreement with the FDA concerning its use of "real-world" data mirrored existing formal "guidance" from the FDA. This guidance, specifically *Best Practices for Conducting and Reporting Pharmacoepidemiologic Safety Studies Using Electronic Healthcare Data* (FDA, 2013), outlined principles and considerations for companies to follow when using "real-world" observational studies. In pertinent part, to enhance transparency and facilitate evaluation of validity, the FDA required submission of study protocols and statistical analysis plans prior to study initiation in order to preclude errors and avoid bias when drawing conclusions.

188. Contrary to its agreement with the FDA and in spite of the FDA's guidance concerning the use of "real-world" data, Karyopharm submitted a "real-world" data study (*i.e.*, the RWD study) to supplement its safety package that had not been included in its study protocol or statistical analysis plans and, at that, contained a number of serious flaws. As explained above in Section II.G. and Section II.I., the analyses within the RWD study were not pre-specified and,

as such, the study had major methodological issues, including selection bias, misclassification, confounding, missing data, and immortal time bias (observation of time periods in which death cannot occur).

189. The FDA guidance applicable to Karyopharm's RWD study explicitly required and emphasized the critical importance of submitting plans and protocols for such studies before initiation. Given that Karyopharm did not do this, Shacham materially misled investors when she falsely represented "we are following the FDA guidance." Whether and to what extent Karyopharm complied with FDA requirements in terms of its safety package submission was likely to (and ultimately did) bear directly on the FDA's response to the NDA. Thus, this information was material and, if disclosed, would have been considered by investors when deciding whether to purchase Karyopharm stock.

**11. September 14, 2018: Conference Call**

190. On September 14, 2018, Karyopharm hosted an analyst conference call to discuss additional results from the STORM study.

191. During the conference call, Kauffman discussed Karyopharm's "real-world" data observational study (*i.e.*, the RWD study), and the conclusions that had been drawn from it, in a materially misleading manner. In response to an analyst question, Kauffman stated in pertinent part as follows:

> <Q: Eric William Joseph [Analyst]> Just a couple of questions from us. I guess first, for either Dr. Jagannath or Dr. Vogl. I guess with dara combinations increasingly being early-line standard of care, I'm just wondering, how we should think about patients achieving minimal response or stable disease in that context in a post-Darzalex combination setting? And how you think about achieving -- or at least able to see how it would sort of factor in either decision to keep a patient on selinexor or move into a potential alternative or move over to another investigative agent, perhaps a clinical trial? And also another question for the company, maybe just you can help us put the survival of 8.6 months into context, how does it contrast with sort of survival expectations in the post dara refractory population.
>
> . . .
>
> <A: Michael G. Kauffman> . . . And the published data suggests that the responses

> -- that the overall survival of this population is between 3 and 4 months without additional treatment -- novel treatment and our overall entire population survival was 8.6 months. And as I -- ***just as a preview, we have also looked into this and tried to come up with additional independent data, which we hope to present in the future suggesting it's 3- to 4-month range for survival in the real world, this is probably accurate***. So we're very excited about the entire population's results.

Emphasis added.

192. Kauffman's above-statements, including in particular the statements identified in emphasis, were materially misleading. The "3- to 4-month range for survival in the real world" was based on the RWD study which, as discussed above in Section II.G. and Section II.I., was severely flawed and statistically unsupportive of any conclusions. In pertinent part, the analyses within the RWD study were not pre-specified and, as such, the study had major methodological issues, including selection bias, misclassification, confounding, missing data, and immortal time bias (observation of time periods in which death cannot occur).

193. Contrary to Kauffman's "3- to 4-month range for survival," the RWD study suggested that median overall survival in the real world was in fact 12.6 months. The FDA made this conclusion after correcting the methodological issues affecting the RWD study. Further, the FDA also concluded that the median overall survival for STORM patients was 10.4 months. Consequently, instead of the RWD study favoring treatment with selinexor, it should that overall survival in the real world was longer than overall survival in STORM patients.

194. Kauffman's "3- to 4-month" survival information was materially misleading in light of the statistical and procedural flaws inherent in Karyopharm's RWD study, and otherwise false given the fact that the RWD study actually showed significantly longer overall survival in patients not taking selinexor. By making the statements he did, Kauffman materially misled investors by falsely representing that Karyopharm had obtained "additional independent data" in support of selinexor's NDA when, in fact, this "additional independent data" was worthless due to its noncompliance with FDA guidance and best practices and/or adverse when the study was corrected.

**12. December 3, 2018: Press Release**

195. On December 3, 2018, Karyopharm issued a press release titled "Karyopharm Reports Updated Selinexor Data from the Phase 2b STORM and Phase 1b/2 STOMP Studies in Relapsed/Refractory Multiple Myeloma at the American Society of Hematology 2018 Annual Meeting."

196. In the press release, Karyopharm materially misrepresented the import of the STORM study data and, in particular, "real-world" data supporting it. The press release provided a description of Karyopharm's "Updated Phase 2b STORM Results" and, in pertinent part, stated as follows:

> . . . The short median OS of patients with no response to selinexor is consistent with the lack of available effective therapies for the very heavily pretreated population who entered the study. Real world OS data were also obtained from the Flatiron Health Analytic Database (FHAD). These results further highlight the limited life-expectancy in patients with highly refractory multiple myeloma. ***OS data from the FHAD indicate that patients with triple-class refractory myeloma (n=69) had a median OS of 3.5 months***, also consistent with previously reported data from the literature.

Emphasis added.

197. Karyopharm's above-statements in the press release were materially misleading. The RWD study, as discussed above in Section II.G. and Section II.I., was severely flawed and statistically unsupportive of any conclusions. In pertinent part, the analyses within the RWD study were not pre-specified and, as such, the study had major methodological issues, including selection bias, misclassification, confounding, missing data, and immortal time bias (observation of time periods in which death cannot occur).

198. Contrary to the press release's "OS of 3.5 months," the RWD study suggested that median overall survival in the real world was in fact 12.6 months. The FDA made this conclusion after correcting the methodological issues affecting the RWD study. Further, the FDA also concluded that the median overall survival for STORM patients was 10.4 months. Consequently, instead of the RWD study favoring treatment with selinexor, it should that overall survival in the

real world was longer than overall survival in STORM patients.

199. The "OS of 3.5 months" survival information was materially misleading in light of the statistical and procedural flaws inherent in Karyopharm's RWD study, and otherwise false given the fact that the RWD study actually showed significantly longer overall survival in patients not taking selinexor. By making the statements it did, Karyopharm materially misled investors by falsely representing that Karyopharm had obtained "additional independent data" in support of selinexor's NDA when, in fact, this "additional independent data" was worthless due to its noncompliance with FDA guidance and best practices and/or adverse when the study was corrected.

**D. The Truth Emerges and Investors Sustain Significant Damages.**

200. On February 22, 2019, the FDA released a briefing document outlining a number of concerns that it intended to discuss with Karyopharm during the ODAC meeting scheduled for February 26, 2019.

201. The briefing document, in pertinent part, expressed serious concerns about the safety and efficacy of selinexor. Contrary to Defendants' statements throughout the Class Period, the FDA stated that "[t]reatment with selinexor was associated with significant toxicity," and that the benefit to patients with multiple myeloma was "difficult to isolate" due to the study designs used by Karyopharm during clinical testing.

202. According to the FDA, data from the previously halted SOPRA study revealed that the median overall survival rate of patients treated with selinexor was 94 days, compared to 170 days for patients treated without selinexor. Indeed, the FDA concluded that in the SOPRA trial, "there was worse overall survival in the selinexor arm, highlighting the toxicity of this drug."

203. The FDA also provided an analysis of the data from Part 2 of the STORM trial that contradicted Defendants' Class Period statements about selinexor. Notably, the FDA stated that twenty-three deaths (of 123 patients enrolled in the study) occurred on or within thirty days of study treatment, and ten of those deaths, or 8.1%, were due to a fatal treatment emergent adverse event. Furthermore, every patient who participated in the STORM trial experienced at

least one treatment emergent adverse event; 93.5% of patients experienced "at least one severe TEAE (Grade 3-4)," and nearly two-thirds of patients experienced at least one serious adverse event. Shockingly, the FDA found that "[t]he toxicity profile observed with selinexor" in multiple myeloma patients "was similar" to what had been demonstrated in the data from the SOPRA study, which had been conducted years earlier.

204. Further, with respect to safety, the FDA indicated that Karyopharm had underreported the number of patient-deaths related to selinexor. Karyopharm had attempted to mark a substantial number of deaths (at least 8) as "non-treatment related." According to the FDA, however, this was inappropriate given the single-arm design study of the trial. In pertinent part, the FDA stated, "[g]iven the difficulty in ascertaining the baselines incidence of adverse events in a population of patients with advanced [multiple myeloma] on a single arm trial [in the absence of a control arm], the [FDA] considers all deaths due to a TEAE in this setting to be treatment-related, unless clearly related to other extraneous causes." In sum, ***the FDA unambiguously concluded that "[t]reatment with selinexor [was] associated with significant toxicity" and has "limited efficacy."***

205. In addition to its conclusions about selinexor's safety and efficacy, the FDA discussed at length Karyopharm's decision to rely on a single-arm study as its pivotal study in support of the NDA (*i.e.*, the STORM study). Without a proper comparative study, the FDA was unable to evaluate selinexor separate and apart from dexamethasone. In pertinent part, the FDA stated that "[g]iven that historical studies have shown response rates of 10-27% to high-dose dexamethasone for RRMM [relapsed or refractory multiple myeoloma] and selinexor did not demonstrate single agent activity in RRMM in the phase 1 trial KCP-330-001, it is difficult to isolate the treatment effect of selinexor." In other words, based on the study, there was no evidence that selinexor, as opposed to dexamethasone, showed any efficacy.

206. Finally, the FDA also rejected Karyopharm's attempt to utilize real-world data in support of its NDA for selinexor. Importantly, Karyopharm had not pre-specified the analysis in its protocol or statistical analysis plan. The FDA also highlighted a number of statistical and

comparative biases that undermined the reliability of the analysis. Accordingly, the FDA had no way of determining whether the analysis had been modified to produce favorable or overly optimistic results.

207. In pertinent part, the FDA's disclosures on February 22, 2019 revealed to the public that selinexor's safety and efficacy data was insufficient to support the approval of the NDA, primarily because the drug was far more toxic and less effective than represented. Moreover, the FDA also revealed that Karyopharm's clinical trials and single-arm study designs were insufficient to support the approval of selinexor for the proposed patient population. In response to these revelations, Karyopharm's stock price declined by more than 43% on unusually high trading volume as the market readjusted its outlook in terms of Karyopharm's prospects for regulatory approval and commercial operations. From its closing price of $8.97 per share on February 21, 2019, its stock price fell to a closing price of $5.07 per share on February 22, 2019.

208. Karyopharm's stock price continued to decline over the course of the next several days in response to ODAC voting on February 26, 2019 to delay Karyopharm's application for approval. From $5.07 per share on February 22, 2019, Karyopharm's stock price fell to $4.13 per share on February 28, 2019.

209. Defendants materially misrepresented and/or concealed the truth about selinexor and its clinical trials during the Class Period. By misleading investors about selinexor's safety and efficacy data, Defendants engaged in a scheme to deceive the market. This scheme artificially inflated and/or maintained a level of artificial inflation in the price of selinexor's stock. When Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Karyopharm's securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Karyopharm's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## E. <u>Additional Scienter Allegations</u>

210. As alleged herein, Karyopharm, Kauffman, and Shacham acted with scienter in

that each Defendant: knew or was reckless in not knowing that the public documents and statements issued or disseminated in the name of Karyopharm were materially false and misleading and/or omitted material information that was needed to make the statements made not misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

211. Kauffman and Shacham, because of their positions within Karyopharm, possessed the power and authority to control the contents of its quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and investors, *i.e.*, the market. They were provided with copies of Karyopharm's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with Karyopharm and their access to material information available to them but not to the public, they knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. They are liable for the false statements pleaded herein.

212. As set forth herein in detail, Kauffman and Shacham participated in the wrongful scheme alleged herein by virtue of: their receipt of information reflecting the true facts regarding Karyopharm; their control over, receipt and/or modification of Karyopharm's allegedly materially misleading misstatements and omissions; and/or their associations with Karyopharm which made them privy to non-public information.

**1. Karyopharm's Clinical Trials Repeatedly Generated Data Showing that Selinexor Was Severely Toxic and Dangerous to Patients.**

213. The entirety of Karyopharm's clinical trial data demonstrated one fact to be true: selinexor was extremely toxic. Without exception, Karyopharm's key clinical trials evidenced unsafe, harsh toxicity that limited the ability of patients to receive treatment. Notwithstanding the

consistency of the trial data, Kauffman and Shacham portrayed selinexor's safety profile as supportive of the drug in terms of obtaining approval from the FDA.

214. Phase 1, which was of acute importance given that it sought to test selinexor alone (monotherapy), first demonstrated the overwhelmingly toxic nature of selinexor. Patients receiving higher doses of selinexor had significantly short durations of treatment, *i.e.*, patients receiving lower doses had a median duration of exposure of 115 days versus patients receiving higher doses who were only able to withstand treatment for a median of 15 days.

215. Karyopharm's SOPRA study, too, evidenced selinexor's severe toxicity. Safety data from the SOPRA study showed that: 100% of the evaluable patients that received selinexor experienced adverse events; 80% experienced serious adverse events; and 20% experienced adverse events that led to death. SOPRA's trial data demonstrated that that any benefits attributable to selinexor were abrogated by its toxicity.

216. Selinexor continued to demonstrate dangerous toxicity in the STORM trial. Data showed that 100% of the enrolled patients experienced a treatment emergent adverse event, that nearly 60% of patients experienced a severe adverse event, and that over 25% of patients permanently discontinued selinexor due to one of these adverse events. Further, the sheer number and magnitude of treatment-related deaths in the STORM study demonstrated a highly toxic drug with a safety record evidencing extremely poor tolerability.

217. The data from these studies operated as red flags that placed Kauffman and Shacham on notice that selinexor's safety profile was materially worse than represented. Thus, Kauffman and Shacham were either aware of the toxicity or deliberately ignored it when making the statements alleged above in Section IV.C., and therefore acted with scienter.

**2. The Design of Selinexor's Clinical Trials Precluded Findings of Statistical Efficacy.**

218. Karyopharm's clinical trials were unable to yield valid statistical evidence of efficacy due to their design.

219. As discussed above in Section II.A., only one arm of Karyopharm's Phase 1 trial

tested selinexor in a monotherapy context, allowing effects from the drug to be attributed to selinexor. Karyopharm's other clinical trials, including its Phase 2 and 2b trials, tested selinexor in combination with dexamethasone. Results from these trials were unable to provide Karyopharm with definitive data in terms of efficacy, given the fact that dexamethasone was at least in part causing the results.

220. Kauffman, as Study Director for selinexor's clinical trials, and Shacham, as Chief Scientific Officer, were integral in designing Karyopharm's studies. Therefore, they were familiar with the studies' shortcomings in terms of being able to produce data capable of demonstrating selinexor's efficacy. Indeed, as the FDA ultimately determined, "[t]reatment with selinexor was associated with significant toxicity" and the benefit to patients with multiple myeloma was "difficult to isolate" due to the study designs used by Karyopharm during clinical testing.

221. Given Kauffman's and Shacham's knowledge of Karyopharm's study designs, they either knew or deliberately disregarded the fact that the studies were unable to confirm the efficacy of selinexor. Thus, when they made the misrepresentations alleged above in Section IV.C., Kauffman and Shacham acted with scienter.

### 3. Karyopharm Attempted Repeatedly to Suppress the Adverse Safety Data.

222. Information from former employees shows that Karyopharm, through Kauffman, Shacham, and other senior managers, attempted to conceal or minimize adverse events related to and/or caused by selinexor. These efforts to conceal and/or minimize the adverse safety data from the clinical trials shows that Kauffman and Shacham, in particular, were aware of selinexor's toxicity and knew that it presented a heightened risk of danger (*i.e.*, materially different than represented publicly).

223. FE1 worked for Karyopharm from April 2016 to August 2016. Karyopharm hired FE1 to build its pharmacovigilance department. FE1's title was Executive Director, Global Head of Pharmacovigilance and head of Drug Safety, which required building and overseeing a drug safety department, to include hiring, training, and mentoring a drug safety team, implementing

systems, processes, and procedures, and handling "all aspects of risk management." FE1 reported to Chief Development Officer Ran Frenkel, who reported to Kauffman. Prior to working at Karyopharm, FE1 was a Consumer Safety Officer/Investigator with the FDA from June 2001 to December 2006. FE1's experience also included serving as the head of safety at four other pharmaceutical companies prior to Karyopharm.

224. When FE1 began working at Karyopharm, it was "a complete mess" when it came to compliance. FE1 said Karyopharm's drug safety pharmacovigilance department was "one of the worst" such departments FE1 had ever seen. It did not have anyone overseeing it fulltime prior to FE1. According to FE1, Karyopharm had been "very behind setting up" its pharmacovigilance department and FE1 found it "frightening" in terms of how out of compliance Karyopharm had been. FE1 spent the first month at Karyopharm "kicking the tires," talking to personnel, hiring staff, and looking at standard operating protocols (SOPs) and procedures (including SOP "gaps") to determine what was going on. FE1 became more uncomfortable with Karyopharm after completing an initial review and discovering "a ton of 483s" on file with the FDA that reflected Karyopharm's "extreme lack of controls" and procedures in regards to drug safety and pharmacovigilance.[1]

225. According to FE1, Karyopharm was supposed to use a safety database named ARIS-G to record adverse events. However, a large number of adverse events had not been entered into an ARIS-G database. Instead of being in the ARIS-G system, several hundred adverse events -- both Adverse Events and Serious Adverse Events -- were in an Excel spreadsheet that was being maintained by two of Karyopharm's safety scientists in the United Kingdom, but had not yet been medically reviewed by Karyopharm and, because they were not in the ARIS-G database, had not been reported to the FDA and other regulatory agencies around the world (*e.g.*, the EMA). The unreviewed adverse events included patients enrolled in the SOPRA study, but

[1] A "483" refers to a Form 483 letter issued by the FDA to drug companies when violations of FDA regulations are observed during inspections. According to the FDA's "Form 483 Frequently Asked Questions" website, "An FDA Form 483 is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts."

was for all studies then underway for selinexor. FE1 said that ensuring these events were in the database was both a "very simple" and "basic" requirement of pharmacovigilance, but which had not been done.

226. According to FE1, every adverse event should have been entered into ARIS-G when it was reported after which it would then be reviewed by one of the two pharmacovigilance safety scientists in the United Kingdom, who would write up a narrative based on their analysis, as well as assigning a code, after which the adverse event would go to a physician for a medical review. Then, the adverse event would go to Karyopharm's Quality Assurance group to ensure that everything about the adverse event had been entered properly without errors. Once this was completed, the adverse event would then be reported automatically by way of the ARIS-G database to all relevant regulatory agencies around the world, including the FDA, the EMA, Germany, and elsewhere.

227. In explaining the importance of properly reporting adverse events during a drug study, FE1 said that in the case of selinexor, the patients involved were either quad- or penta-refractory, meaning they had already tried four or five previous therapies for their cancers that had failed. As such, selinexor was the "last chance" for these "very sick patients." Further, many of these patients had other conditions and were also on other drugs, so determining the causality of an adverse event for these "not very healthy patients" required patience and skill. If a medical review concluded that a given adverse event was not related to the drug being studied, then it did not have to be reported, but FE1 emphasized that it was unethical to not report adverse events that might be related to the drug and it was also necessary to actually do the medical review to determine if the event was in fact unrelated to the drug.

228. FE1 hired Cynthia Nasiatka to be Director of Operations in or around July 2016. Shortly after commencing work, Nasiatka alerted FE1 to an Excel spreadsheet containing adverse events that had not been entered into the ARIS-G system. FE1 tasked Nasiatka with going through "line by line" to determine the total number of adverse events that had not been reported in ARIS-G. Nasiatka determined there were altogether 353 adverse events (including both Adverse Events

and Serious Adverse Events) that should have been, but had not been medically reviewed or entered into the ARIS-G database and therefore had not been reported to the necessary regulatory agencies. The unreviewed adverse events included patients enrolled in the SOPRA study, but was for all studies then underway for selinexor.

229. Once FE1 discovered there were 353 unreported Adverse Events and Serious Adverse Events in the Excel spreadsheet, FE1 had a meeting with Kauffman, Shacham, FE2 (Karyopharm's Medical Director of Safety), and Nasiatka. At the outset of the meeting, FE1 said to Kauffman, "We need to talk, I have some extremely distressing news" and informed him of the unreported adverse events. The problem was that Karyopharm wanted to submit an NDA for selinexor in January 2017 but there would be no way for FE1's staff (including FE2) to undertake a proper medical review of the 353 unreported adverse events by that time with the resources and personnel that were available. FE1 emphasized the time and skill it takes for a proper medical review of adverse events. For instance, FE1 could – as a "best case" – do seven to eight such reviews a day with each one taking anywhere from half an hour to two hours to read and assess by a suitably experienced and trained medical professional.

230. FE1 reiterated that there was not enough time to evaluate all of the adverse events that were missing from the ARIS-G system in time for the January 2017 NDA, a point FE1 made to Kauffman at the meeting, but FE1 also proposed a solution. FE1 had gone to a clinical research organization and received two estimates to for the work: the first was for the clinical research organization to do the adverse event evaluations and entries within six weeks, which would cost \$300,000; the second was to do the work in six months, which would cost \$200,000.

231. FE1 said that Kauffman "went ballistic on the cost" and about the risk of the NDA submission timeline not being met. Kauffman insisted that the work could be done faster, to which FE1 responded that it could not be, emphasizing how drug safety is its own specialty that not just any physician can perform. Kauffman declared he was not going to pay the clinical research organization for the work, to which FE1 said, "I don't know what to tell you." FE1 reiterated what the nature of the problem was and what FE1 considered to be the best solution, but Kauffman

"didn't want to hear it."

232. FE1 told Kauffman that unless the adverse events were reviewed and entered into the system, the FDA would ultimately issue a clinical hold on Karyopharm. Kauffman insisted that the work could be done "in-house" and that he (Kauffman), FE1, FE2, and two other physicians at the company would do the work and that FE1 would teach them how to do the reviews. FE1 said this simply could not be done as Kauffman was insisting because of the time it takes to learn how to do adverse event reviews, but Kauffman said that "anyone" could do that kind of work, which FE1 said was not the case. Matters got "nasty" in the meeting to the point that FE1 quit that very day. FE1 reiterated that Kauffman became upset because of the cost and delay that would be caused by evaluating the adverse events and entering them to the ARIS-G system.

233. FE1 was personally shocked at how many adverse events were reported for selinexor and that just about every patient who received selinexor in Karyopharm's studies had an Adverse Event or Serious Adverse Event. As FE1 put it, selinexor was "almost as toxic" as the very disease it was intended to treat. FE1's opinion is that selinexor should not have been approved by the FDA because the risks of the drug outweighed the benefits even for patients like those eligible to receive selinexor – an opinion, FE1 noted, with which the FDA's Advisory Committee agreed. As FE1 pointed out, selinexor did not cure the conditions of the patients who received it, rather it possibly extended them a few months of additional life. Ultimately, the FDA's approval of selinexor reflected the FDA's position of not wanting to deny patients "one last hope" of treatment.

234. Within a week or two of FE1 leaving Karyopharm, FE1 received a call from the Medical Director of Safety he had hired – FE2 – saying that Ran Frenkel, Karyopharm's Chief Development Officer, was pressuring her to falsify data. More specifically, Frenkel was pressuring FE2 to change the causalities for adverse events (*i.e.*, the causalities were ***not*** related to selinexor), which, if true, was "absolutely unethical" for Karyopharm to do. FE1 told FE2 that she could and should report whatever concerns FE2 had to the FDA (specifically, the New

England Regional FDA office), noting that FE2 could make such reports anonymously. FE1 told FE2 to make copies of relevant documents and emails and maintaining notes and a journal of the concerning events. FE1 was not surprised by what FE2 said. It reflected the fact, according to FE1, that Kauffman and Shacham had ways of doing things that "didn't seem right" and who operated Karyopharm as their own "fiefdom." Nothing could be done at Karyopharm "without their OK," according to FE1.

235. In addition to FE2, other Karyopharm employees contacted FE1 to discuss occurrences at the company that they thought were illegal or unethical. These individuals were Maureen Quick, Manager of Safety, and Julie Greenlees, a consultant/contractor within the pharmacovigilance team. FE1 said that Quick and Greenlees had not been specific about what concerned them, but FE1 told them the same advice that FE1 gave to FE2, which was to memorialize the details of their concerns, including dates and times of the events that concerned them. FE1 noted that Quick and Greenlees each had between 10 and 15 years of professional experience, indicating that their concerns were to be taken seriously.

236. In January 2017, two FDA criminal investigation agents came to FE1's home to ask questions about Karyopharm falsifying adverse event reports in order to "jack up the price of the stock." As FE1 recalled, the agents (a man and woman) were from the FDA's Washington, D.C. headquarters. FE1 told the investigators that when FE1 came to Karyopharm, it had been "completely out of compliance" and FE1 had been concerned at the time that if the FDA "walked in" they "would put us on a clinical hold" for the lack of controls in place. FE1 said that Karyopharm was out compliance not just with the FDA but with the EMA and other global regulatory agencies.

237. FE2 joined Karyopharm as its Medical Director of Safety in or shortly after April 2016 after being hired by FE1. FE2 attended and corroborated the meeting described by FE1 above in which FE1 told Kauffman about the unreported adverse events in the Excel spreadsheet.

238. FE2 confirmed that shortly after FE1 quit, Frenkel began pressuring and threatening FE2 to falsify the adverse event reports. FE2 explained that, in addition to Frenkel,

Shacham and Amer Alghabban, Karyopharm's Vice President Good Clinical Practices Quality Assurance, Compliance and Training, were also pressuring FE2 to falsify the adverse event reports. Specifically, Frenkel, Shacham, and Alghabban pressured and threatened FE2 to report that the adverse events were ***not*** related to treatment with selinexor.

239. FE2 explained that Karyopharm routinely concealed adverse events from the FDA. The adverse events should have been entered in Karyopharm's database, but instead were sent to a "separate email inbox." According to FE2, "[Shacham] managed to suppress" the reporting of the adverse events, which included Serious Adverse Events and totaled "hundreds, thousands of cases" for which records existed that had never been reported to the FDA.

240. FE2 reported to Frenkel that there were hundreds of adverse events that had not been reported to the FDA. In response, Frenkel "sent emails threatening [FE2]" to stop discussing the "bad" findings, to "stop saying anything bad," that FE2 would be fired if FE2 continued and did not re-write the adverse event reports because Shacham did not want the adverse events reported. Alghabban similarly instructed FE2 against reporting the adverse events, even though FE2 said that the "backlog" had to be reported. According to FE2, Karyopharm ultimately reported adverse events, but did so "inadequately" because "99%" of them were reported as "not related" to selinexor.

241. FE2 discussed the adverse events with Karyopharm's clinical research organization, who told FE2 that they had been instructed by Karyopharm to not report major events as related to selinexor if there were minor events that could be reported instead. For instance, there was a patient who had fallen, hit his head and experienced hemorrhaging. At the hospital, the patient received an evaluation which also revealed some kidney dysfunction. Karyopharm reported the patient's fall as "the first event," not the kidney condition which was very relevant to the patient's reaction to receiving selinexor. FE2 prepared a safety narrative in which she was going to include the kidney condition, but Shacham "cut me off" and prevented "us" from reporting accurately about this patient's kidney condition.

242. The threats and pressure from FE2's superiors led FE2 to contact FE1 after FE1

left Karyopharm and ask for help with respect to the adverse events. Kauffman, too, pressured FE2 to falsify the adverse event reports. FE2 recalled Kauffman saying "you're smart, you know how to write" the reports, suggesting that FE2 should write them in such a way as to conclude that the adverse events were unrelated to selinexor.

243. On March 3, 2017, the FDA issued a partial clinical hold over Karyopharm's existing selinexor trials, which at the time included Part 2 of the STORM trial. A clinical hold is an order by the FDA to delay or suspend part of a sponsor's clinical trials.

244. The FDA issued the clinical hold after discovering that Karyopharm had omitted and withheld serious adverse events from selinexor's safety database. This issue, according to the FDA, presented an "unreasonable and significant risk of illness or injury" to trial participants.

245. The FDA concluded that Karyopharm's then-current version of its investigator brochure was "misleading, erroneous, or materially incomplete" due to its omission of serious adverse events associated with selinexor. An investigator brochure is a required, formal document that contains all relevant clinical and nonclinical data relating to a clinical study.

246. Karyopharm continued to minimize adverse safety information during its clinical trials and in its NDA. As the FDA explained in its evaluation of the STORM data, "of the 10 deaths due to a TEAE in Part 2, [Karyopharm] designated 2 deaths as 'treatment related' (pneumonia and sepsis), and the remaining 8 deaths as 'non-treatment related' (pneumonia, sepsis, subdural hematoma, cardiac disorder, fungal sepsis, multiple organ dysfunction syndrome, respiratory arrest, and septic shock). However, because treatment with selinexor is associated with risk of infection, it is notable that 4 of the 8 deaths classified as 'non-treatment related' were due to infection. Given the difficulty in ascertaining the baseline incidence of adverse events in a population of patients with advanced [multiple myeloma] on a single arm trial, the [FDA] considers all deaths due to a TEAE in this setting to be treatment-related, unless clearly related to other extraneous causes."

247. FE3 worked with Karyopharm as a Consulting Physician for in connection with selinexor's NDA from May 2018 to November 2018. In pertinent part, FE3's job responsibilities

included reviewing and/or summarizing adverse event information and performing clinical assessments of the adverse events for the purposes of discussion with the FDA.

248. FE3 was part of a team tasked with reviewing "cases" related to adverse events and serious adverse events that were reported by field medical investigators for patients that had received selinexor as part of the trials underway for the drug. The field medical investigators would assess an event to determine the reason for the event and to include whether the event was attributable to the patient receiving selinexor. FE3 reviewed the assessments of the field medical investigators and then provided an independent assessment. FE3's assessment formed the basis of whether Karyopharm agreed or disagreed with the field medical investigator's assessment and be reported with its NDA. In other words, FE3 performed medical reviews of individual case safety reports from clinical trials and Karyopharm's assessments, and ultimately determine regulatory responsibility.

249. According to FE3, Karyopharm's Vice President, Pharmacovigilance, Kumiko Yanase, actively attempted to prevent FE3 from reporting safety concerns about selinexor. In response to FE3's determinations, Ms. Yanase would respond to his draft reports, ask why he thought a particular adverse event was due to selinexor, and then oppose his conclusions on the basis that he was "creating unnecessary questions" with the FDA.

250. FE3 recalled two incidents in which he had agreed with the medical investigator in the field that a particular adverse event was due to the patient receiving selinexor, but for which Ms. Yanase wanted him to change his assessments. FE3 explained that Ms. Yanase had no valid basis to be contrary to what the field medical investigator had reported and with what he, in turn, had assessed and concurred. FE3 emphasized that he had told Ms. Yanase he would not make the changes she wanted, but that others in his role who were in greater need of their jobs likely did when they received such requests from her.

251. FE4 worked at Karyopharm as a Clinical Research Scientist from November 2018 to December 2019. FE4 reported to Maitreyi Sharma, Senior Medical Director and Head of Clinical Research Science, Clinical Development, who, in turn, reported to Karyopharm's Chief

Medical Officer, Jatin Shah.

252. FE4 was heavily involved with selinexor's clinical trials while at Karyopharm, including responsibilities such as trial protocol development, coordinating and facilitating regulatory reviews, data validation, and assisting in trial data reviews and analyses. This included primarily the BOSTON trial, but also responding to requests for information from the FDA related to the STORM study in late-December 2018. In line with these responsibilities, FE4 assisted Karyopharm in responding to the FDA's information requests relating to the STORM study and preparing material for use at the ODAC meeting on February 26, 2020.

253. FE4's work at Karyopharm required her to review and become familiar with the STORM data, which had already been submitted to the FDA by the time FE4 joined Karyopharm. In that regard, FE4 discovered "basic information" was missing from the submission, including that adverse events were omitted from Karyopharm's databases. This was evident because patient files would indicate "sepsis" without any prior or preceding evidence of an adverse event and/or side effect. Sepsis, however, is the last stage of infection. Therefore, a patient file indicating sepsis without any preceding evidence of an adverse event and/or side effect was, by definition, missing material safety information.

254. FE4 reported the issue to Sharma. In response, FE4 was told that they did not agree and that they were worried earlier reports of infection preceding sepsis would be counted as an adverse event by the FDA.

255. Regardless of whether the FDA would consider side effects prior to sepsis as adverse events, regulation required Karyopharm to record this information. Notwithstanding, FE4 confirmed that Karyopharm deliberately failed to do this and, as a result, submitted a significant amount of data to the FDA with its NDA that had not been properly validated (or "cleansed"). According to FE4, Karyopharm's Chief Medical Officer, Jatin Shah, had approved the submissions to the FDA knowing that they omitted critical and required safety information.

256. Relatedly, Karyopharm also failed to adequately assess and document the patient deaths that occurred during the STORM study. According to FE4, the FDA had asked questions

about the manner in which patients in the STORM study had died because it was not clear from Karyopharm's submission whether those deaths were due to the diseases of the deceased patients progressing or because of receiving selinexor. FE4 was tasked with responding to these questions and determining whether the patient deaths were related to treatment with selinexor. FE4 said that based on the data, Karyopharm had not done a good job in documenting the reasons and circumstances of patient deaths, which caused the FDA to identify "a lot of safety issues" relating to selinexor.

257. FE4 ultimately left Karyopharm because it had been reporting data "in a very wrong fashion." FE4 was "trying to clean up the data" for the BOSTON study, but the problem persisted due to the fact that Karyopharm continued using personnel who had no experience reviewing clinical data. FE4 confirmed that Karyopharm had, in fact, excluded a lot of critical data in what it had submitted in the NDA to the FDA. Through FE4's work at Karyopharm, it became "crystal clear" that the company had deliberately concealed and hidden data from the FDA. This data included Serious Adverse Events that were not reported to the FDA pursuant to Shah's approval even though they were linked to treatment with selinexor. For example, some medical monitors complained that selinexor had side effects like dementia because patients were "forgetting everything." The medical monitors spoke with the executives within Karyopharm who did not want to listen and said that selinexor "didn't do that" and did not want to accept that selinexor might have been the cause. Instead, the executives proposed that the dementia was a byproduct of other drugs the patients were taking, but FE4 knew the other drugs were well-established and that dementia-like side effects were not associated with those drugs

258. Based on the foregoing, Karyopharm's omissions in its regulatory filings were part of a larger effort to downplay selinexor's risks and improve the drug's overall safety profile. This further demonstrates Kauffman's and Shacham's knowledge that selinexor's safety profile was materially worse than represented. Thus, Kauffman and Shacham were either aware of the toxicity or deliberately ignored it when making the statements alleged above in Section IV.C., and therefore acted with scienter.

### 4. Kauffman and Shacham Knew that Karyopharm Did Not Specify the RWD Study in Study Protocol or Statistical Analysis Plans.

259. Given their roles within Karyopharm, Kauffman and Shacham were thoroughly involved in preparing selinexor's NDA. Indeed, they regularly spoke with the FDA about the filing and attended meetings with the FDA, including the "Type B" pre-NDA meeting with the FDA on June 22, 2018 where the FDA and Karyopharm agreed on the contents of the NDA submission.

260. Notwithstanding the foregoing and in spite of each of their familiarity with FDA procedure, they caused Karyopharm to submit the RWD study. The FDA rejected the study on the basis that Karyopharm had not pre-specified the analyses in its protocol or statistical analysis plan. Moreover, according to the FDA, the RWD study's analyses included a number of statistical and comparative biases that undermined its reliability.

261. Kauffman's and Shacham's attempt to use the RWD study was a blatant violation of FDA guidance requiring pre-specification of study protocols, one of the most elementary rules and basic tenets of best practices. Their violation of the FDA guidance in this regard demonstrates intentional conduct in light of their prior agreements with the FDA about the contents of the NDA submission.

262. Kauffman's and Shacham's attempts to rely on the RWD study as support for selinexor evidences that they knew the clinical trial data in hand was inadequate to support approval for the indication as it existed at that time. Moreover, given that they knew the RWD study analyses were not pre-specified in the study protocol or statistical analysis plans and therefore unable to substantiate any conclusions by the FDA, Kauffman and Shacham acted with scienter when making statements about the RWD study and/or Karyopharm's compliance with FDA guidance in regards to it.

### 5. Selinexor's Importance to Karyopharm Supports a Strong Inference of Scienter under the Core Operations Doctrine

263. Selinexor is and has been Karyopharm's lead drug candidate for the better part of

the past decade. To date, Karyopharm and its co-founders, Kauffman and Shacham, have invested nearly $1 billion, about a quarter of which was spent prior to even commencing selinexor's Phase 1 trial. Without dispute, selinexor is Karyopharm's most critical operation and was at all relevant times its only means to generating revenue. Thus, Karyopharm's success as a company depended heavily, if not solely, on generating positive safety and efficacy results from its clinical trials.

264. It would be absurd to suggest that Kauffman and Shacham were not aware of details surrounding selinexor's clinical trials and the subsequent NDA application. Indeed, as discussed above in Section IV.C., Kauffman and Shacham demonstrated their knowledge over selinexor's clinical trial results by frequently and repeatedly discussing the data and Karyopharm's NDA. Moreover, Kauffman and Shacham both served as direct points of communication between Karyopharm and the FDA, as evidenced by their in-person attendance at the "Type B" pre-NDA meeting with the FDA on June 22, 2018. Therefore, Kauffman and Shacham had access to and concealed information concerning the clinical trial data and its impact on selinexor's NDA.

265. Accordingly, Kauffman and Shacham must have known or were reckless in not knowing that their statements to the public about selinexor in the context of the clinical trial results were materially misleading. Their access to documents and information related to the Karyopharm's most critical clinical trials for their most important drug, and the application for approval of that drug supports a strong inference that they acted with scienter in connection with the material misrepresentations alleged above in Section IV.C.

**6. Corporate Scienter Doctrine.**

266. Karyopharm is liable for the acts of its employees, including Kauffman and Shacham, under the doctrine of *respondeat superior* and common law principles of agency, as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

267. Kauffman's and Shacham's scienter and other employees and agents is imputed to Karyopharm under the doctrine of *respondeat* superior and common law agency principles.

**F. Inapplicability of Statutory Safe Harbor**

268. Karyopharm's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

269. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Karyopharm who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

**G. Presumption of Reliance**

270. At all relevant times, the market for Karyopharm's securities was an efficient market for the following reasons, among others:

a) Karyopharm common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) As a regulated issuer, Karyopharm filed periodic public reports with the SEC and NASDAQ;

c) Karyopharm regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide- ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) Karyopharm was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

271. As a result of the foregoing, the market for Karyopharm securities promptly digested current information regarding Karyopharm from all publicly available sources and reflected such information in the price of Karyopharm securities. Under these circumstances, all purchasers of Karyopharm securities during the Class Period suffered similar injury through their purchase of Karyopharm securities at artificially inflated prices and the presumption of reliance applies.

272. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the results of clinical trials of the Company's lead drug candidate—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the clinal trial results to the approval of selinexor and Karyopharm's subsequent commercialization of the drug, and the impact that could have on the Company's future revenue generation, that requirement is satisfied here.

## H. Count III – Section 10(b) of the Exchange Act and SEC Rule 10b-5

273. Plaintiff repeats and realleges the allegations in ¶¶11-71 and ¶¶128-246 as if fully set forth herein.

274. Plaintiff brings this Count III against Karyopharm, Kauffman, and Shacham.

275. During the Class Period, the defendants named in this Count carried out a plan,

scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Karyopharm securities at artificially inflated prices.

276. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Karyoparm's securities in an effort to maintain artificially high market prices in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

277. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Karyopharm's financial well-being, operations, and prospects.

278. During the Class Period, the defendants named in this Count made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

279. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Karyopharm's true condition from the investing public and to support the artificially inflated prices.

280. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Karyopharm securities. Plaintiff and the Class would not have purchased Karyopharm's securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent

course of conduct.

281. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Karyopharm's securities during the Class Period.

282. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### I. Count IV – Section 20(a) of the Exchange Act

283. Plaintiff repeats, incorporates, and realleges the allegations in ¶¶11-71 and ¶¶128-256 as if fully set forth herein.

284. Plaintiff brings this Count IV against Kauffman and Shacham.

285. The defendants named in this Count acted as controlling persons of Karyopharm within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of Karyopharm's operations, direct involvement in the day-to-day operations, and/or intimate knowledge of its actual performance, and their power to control public statements, the defendants named in this Count had the power and ability to control the actions of Karyopharm and its employees. By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## V. CLASS ACTION ALLEGATIONS

286. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired: (i) purchased shares of Karyopharm's securities during the Class Period; (ii) purchased Karyopharm shares in or traceable to its public offering of common stock conducted on April 26, 2017; and/or (iii) purchased Karyopharm shares in or traceable to its public offering of common stock conducted on May 3, 2018. Excluded from the Class are Defendants; present and former officers of Karyopharm; members of Karyopharm's Board of Directors; members of the immediate family (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)) of any such excluded person; the legal representatives, heirs successors, or assigns of any of these individuals and

entities; any entities in which Defendants have or had a controlling interest; and any subsidiary or affiliate of Karyopharm; Karyopharm's employee retirement and benefit plan(s) and the participants in such plan(s), and their beneficiaries, to the extent they purchased through such a plan; and the legal representatives, heirs successors, or assigns of any of the foregoing excluded individuals and entities.

287. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of April 30, 2019, Karyopharm had over 60 million shares of common stock outstanding, owned by hundreds or thousands of investors.

288. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a) Whether Defendants omitted and/or misrepresented material facts;

b) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c) Whether the Officer Defendants and the Director Defendants are personally liable for the alleged misrepresentations and omissions described herein;

d) Whether Defendants' conduct impacted the price of Karyopharm securities;

e) Whether Defendants' conduct caused the members of the Class to sustain damages; and

f) The extent of damage sustained by Class members and the appropriate measure of damages.

289. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

290. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

291. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding damages to Plaintiff and members of the Class pursuant to Section 11 of the Securities Act;

C. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

E. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## VII. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

//

//

//

//

//

//

Dated: October 13, 2020[2]

Respectfully submitted,

ANDREWS DEVALERIO LLP

_*s/ Daryl Andrews*______________
Glen DeValerio (BBO# 122010)
Daryl Andrews (BBO # 658523)
P.O. Box 67101
Chestnut Hill, MA 02467
Telephone: 617-999-6473
Email: glen@andrewsdevalerio.com
daryl@andrewsdevalerio.com

*Liaison Counsel for Lead Plaintiff and the Class*

Shannon L. Hopkins (BBO# 657485)
LEVI & KORSINSKY, LLP
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: 203-992-4523
Email: shopkins@zlk.com

-and-

Nicholas I. Porritt (*pro hac vice* to be submitted)
Adam M. Apton (*pro hac vice*)
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Telephone: 212-363-7500
Email: nporritt@zlk.com
aapton@zlk.com

*Attorneys for Plaintiff and Lead Counsel for the Class*

[2] Per Court Order [ECF 38] dated October 16, 2020, this complaint is deemed filed for all purposes as of October 13, 2020.